FILED ✓ ___ LODGED
___ RECEIVED ___ COPY

MAR 2 5 2014 ↙

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

1  HUGH GERALD BUFFINGTON
   TERRY L. BEHRENS
2  515 E CAREFREE HWY #329
   PHOENIX, AZ 85085
3  *In ProSe (self represented litigant)*

4

5  # UNITED STATES DISTRICT COURT

6  # DISTRICT OF ARIZONA

7

CV-14-00615-PHX-MHB

8  **HUGH GERALD BUFFINGTON, AND**      **CASE NO.:**

9  **TERRY L. BEHRENS**

10                        Plaintiffs,      **VERIFIED COMPLAINT**

11  VS.

12                                          **FOR INJUNCTIVE AND DECLARATORY**

13  **U.S. BANK, N.A.**                     **RELIEF;**
                                            **BREACH OF CONTRACT UNDER GOOD**
14  **OCWEN LOAN SERVICING LLC**            **FAITH AND FAIR DEALING;**
15                                          **NEGLIGENCE PER SE;**
16                        Defendants        **PAYMENT OF DEBT; AND**
17                                          **CANCELLATION OF RECORDED**
18                                          **INSTRUMENTS**

19

20

21

22      COMES NOW Hugh Gerald Buffington and Terry L. Behrens, ("Plaintiffs"), and

23  state in their Complaint against U.S Bank National Association, as trustee for the certificate

24  holders of LXS 2007-4N (a securitized Real Estate Mortgage Investment Conduit "REMIC")

25  in c/o OneWest Bank, FSB, (hereinafter "U.S. Bank") and Ocwen Loan Servicing LLC

26  (hereinafter "Ocwen"), collectively referred to as ("Defendants") as follows:

## STATEMENT OF CASE

1.      By this action Plaintiffs pray for injunctive relief to enjoin Defendants from executing on their Property by a trustee sale to prevent a wrongful foreclosure, and declaratory relief in form of declaration of breach of contract under mortgage servicing rights, the rights and duties of partiers; cancellation of false documents such as the purported assignments of deed of trust together with the notice of trustee sale, and against interests that create both legal and equitable "cloud on title".

2.      Plaintiffs seek declaration that the trustee lacks the authority to conduct trustee sale, received payment and discharged the underlying debt; and for damages for breach of contract under good faith and fair dealing and negligence per se.

## THE PARTIES

3.      Plaintiff, Hugh Gerald Buffington and Terry L. Behrens, living in the State of Arizona at all times relevant to the Complaint, (hereinafter also referred to as "Plaintiff")

4.      Defendant U.S Bank N.A. (hereinafter referred to as "US Bank"), is believed to be a national bank acting as trustee for the LXS 2007-4N (a securitized Real Estate Mortgage Investment Conduit "REMIC") in care of OneWest Bank, FSB with principal address at 888 E. Walnut Street in Pasadena, California 91101.

5.      Defendant Ocwen Loan Servicing LLC (hereinafter "Ocwen"), is believed to be mortgage servicer under the Pooling and Servicing Agreement acting on behalf of US Bank to conduct loan servicing with only disclosed principal address under PO Box 24736 in West Palm Beach, Florida, 33416.

6.      Defendant, U.S. Bank via a certain assignment of said deed of trust claims to be the

beneficiary and/or hold security interest against Plaintiff's "Property"

7.     The Trust Deed is further identified as Document No.: 20060972135.

8.     Plaintiff, , Hugh Gerald Buffington and Terry L. Behrens are the owners of property located at 39824 North 3rd Street, Phoenix, Arizona 85086 further identified by Maricopa County Assessor's Office Tax Parcel Number: APN(s) 211-73-049-A and the legal description attached hereto

### JURISDICTION AND VENUE

9.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.   Specifically, the amount in controversy exceeds $75,000.00 because Plaintiffs seek retention of the Property, the value of which exceeds $75,000.00.

10.     Complete diversity is present in this matter. Plaintiff is citizens of Arizona, and the Property underlying the dispute is located in Arizona. Both U.S. Bank and Ocwen are out-of-state corporations and/or entities doing business in Arizona.

11.     Venue is proper in the Court as the Plaintiffs are domiciled in Maricopa County, Arizona.

12.     Venue is proper because the real estate that is the subject of this complaint is situated in Maricopa County, Arizona.

13.     This Court has jurisdiction under 28 U.S.C. § 1331 because there are questions arising under federal law 15 U.S.C. §1601 et seq and the Home Affordable Modification Program ("HEMP"), § 230(b) of the National Housing act (12 U.S.C 1715u(b)) as amended by Helping

Families Save Their Homes Act of 2009, division of public law 111-22.

## **FACTUAL BACKGROUND**

14.     Plaintiff entered into a deed of trust contract with MortgageIt Inc., organized and existing under the laws of New York with mailing address at 33 Maiden Lane, 6th Floor, New York, NY 10038. TransNation Title located at 1211 N Tatum Blvd, Suite 200 in Phoenix, AZ 85028 was named the trustee holding legal title to the ("Property") with Mortgage Electronic Registration Systems, Inc. (MERS) the beneficiary holding an enforceable lien.

15.     That contract involved a promissory note secured by a deed of trust.

16.     The promissory note on its face advised the borrowers that the lender, or anyone that takes this note by transfer and who is entitled to receive payments under the note is a "note holder"; therefore the note is the "contract" upon which the breach of contract occurred.

17.     Shortly after the execution of the deed of trust (DOT) and the promissory note (Note) the loan servicing right have been transferred to IndyMac Mortgage Services, a division of OneWest Bank, FSB and the beneficial interest in the note was allegedly assigned to U.S. Bank N.A. as Trustee for the LXS 2007-4N (a securitized Real Estate Mortgage Investment Conduit "REMIC").

18.     In early part of 2009, as an all-too familiar scenario unfolded across Arizona and America, the homeowners were in risk of defaulting on their loan and asked the servicer for help in modifying their payments. At the time, the homeowners were told that in order to qualify for the modification process they needed to default on their loan. Shortly after the homeowners withheld payments and in August of 2009 were offered a trial modification that began on October 1st, 2009.

19.     During the loan modification process the homeowners were promised that the

temporary payment schedule would not ruin their credit, yet IndyMac reported the delinquent payments to the Credit Bureaus further destroying the homeowners prospect for a refinance, causing their credit card companies to lower limits, raise interest rates, only further aggravating their financial situation.

20.     The temporary payments were supposed to end on December 31st, 2009 after which the loan modification was to be complete.

21.     In January 2010, homeowners received a loan modification acceptance with an unsigned loan modification packet. They completed, signed the documents and returned to the servicer.

22.     On or about February, 15th, 2010 the homeowners received a letter from the IndyMac that the documents mailed to them were processed in error and they will receive a second set of documents. In the second pack of loan documents IndyMac adversely changed the terms and conditions of the first loan packet of modification documents they have already signed and mailed in.

23.     During their loan modification process, a next-door neighbor lost his home to foreclosure also with IndyMac as the servicer, and apparently the sale of the house next door has effectively reduced the comps that were used to value their house in the current market.

24.     The homeowners had no choice but to accept the second set of conditions but the documents given to them were again unsigned by the lender, where the face of the documents clearly stated: "not a valid contract until both parties sign it".

25.     For months thereafter, IndyMac continued to refused to provide the homeowners with signed loan documents by the investor or entity holding beneficial interest.

26.    On September 22nd, 2010, Perry&Shapiro LLP, as substitute trustee appointed by OneWest Bank on or about 16th of September, 2010 filed for foreclosure claiming to be the beneficiary in interest to the deed of trust and the note.

27.    In 2009 IndyMac went into FDIC receivership and servicing right to parts of the loans were sold to OneWest Bank. During this time, FDIC reimbursed OneWest Bank on behalf of U.S. Bank N.A. as trustee for the REMIC trust pursuant to the attached "Shared-Loss Agreement" 80% of the default in payments.

28.    In January of 2011, the homeowners were evicted from their home and a Trustee's Deed upon Sale was signed and recorded January 6th, 2011.

29.    On January, 16th, 2011 Perry & Shapiro LLP, as the effective foreclosure trustees and foreclosure document preparers, recorded an Assignment of Deed of Trust assigning beneficiary interest from MERS to OneWest Bank. On the face, their assignment was backdated to September 9th, 2010 and executed by such Suchan Murray, assistant vice president for MERS as nominee for MortgageIt, Inc.

30.    Nine months later on September 12th, 2011 the same foreclosure trustees reversed the trustee sale and recorded a cancellation of trustee sale, however they failed to notify the homeowners as trustors of the cancellation.

31.    Not until January 2012, and through numerous complains and code violations of neglect that the homeowners found out about the change of title and returned to the home to clear pigeon droppings, weeds that posed fire hazard, and required maintenance due to the servicer's overall neglect of the property.

32.    On March 28th 2012, OneWest Bank purported yet another assignment assigning

beneficiary interest from OneWest Bank to U.S. Bank N.A. as trustee for the LXS 2007-4N.

33.     Not until January 4th 2013, did OneWest Bank cause to record a new notice of trustee sale on behalf of U.S. Bank by OneWest Bank as attorney in fact. Equally on the same date did OneWest Bank signed and executed yet another substitution of trustee appointing Shapiro, Van Ess and Sherman LLP as the active foreclosure trustees.

34.     In November 2013, servicing rights were divested away from OneWest Bank and transferred to Ocwen Loan Servicing LLP.

35.     Attorney for Ocwen Loan Servicing LLC, Charles "Toni" Piccuta of Houser & Allison APC in Irvine, California, refused to address homeowners issues in terms of loan modification and the shared-loss agreement with FDIC, rejected the homeowners counter offer, and on or about March 10th, 2013 informed the homeowners: "you should proceed as if Ocwen is going to foreclose".

## GENERAL ALLEGATIONS

36.     Homeowners as Plaintiffs hereon allege that the Defendants as assignee lenders, have no security interest in the mortgage/deed of trust security instrument and the underlying promissory note, and lacked and still lack the authority to conduct trustee's sale of their home.

37.     Plaintiffs further allege that both substitution of trustee signed by OneWest Bank are defective based on which Plaintiffs ask to cancel the active notice of trustee sale and vacate the trustee sale. In *Eardley v. Greenberg*, 164 Ariz. 261, 792 P.2d 724 (1990) trialable issue existed as to whether the substitution was defective, because the notice may have been signed by the successor trustee may have been signed without the authority or permission from one of the beneficiaries.

38.     Plaintiffs allegations are further bolstered by the Arizona Court of Appeals recent holding in Steinberger v. McVey ex rel. County of Maricopa, 2014 WL 333575, *7-8 (Ariz. Ct. App. January 30, 2014), in which the court recognized a "cause of action to void a trustee sale" and held that a borrower could bring this cause of action if the borrower was in default and possessed a good faith basis to dispute the authority of an entity to conduct a trustee's sale.

39.     Plaintiffs allege breach of contract under the covenant of good faith and fair dealing, which is implied in every contract. *See Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986). Plaintiffs allege that the Deed of Trust imposes obligation on the parties with respect to loan modification.

40.     Plaintiffs conducted a thorough search of the whereabouts of their promissory note and ownership of their mortgage and during the process discovered that the loan was never flagged for loan modification even though they made trial payments on the loan from October to December of 2010.

41.     Plaintiffs as homeowners were misled into a viable loan modification that instead of helping them actually destroyed their credit worthiness and caused financial harm, all while OneWest bank was allowed to recapitalize on the homeowners trial payments tricking them into actual loan modification.

42.     Plaintiffs further allege that OneWest, as agent for US Bank, never had the lawful authority to grant, sell, assign, transfer or convey onto U.S. Bank N.A. the beneficiary interest under the certain deed of trust described therein with the note and obligations therein.

43.     Defendants knowingly and willfully conspired, engaged in common enterprise,

and/or engaged in common course of conduct to accomplish the wrongs in causing to report unlawful and void documents falsely purporting ownership of the deed of trust and note.

44.     Plaintiffs allege that since U.S. Bank never acquired any legal or beneficial interest (either by deed or note), they are not indebted to U.S. Bank and therefore have no legal obligation to pay U.S. Bank via Ocwen.

45.     Plaintiffs believe and thereon allege that U.S. Bank and Ocwen are false successors only to represent servicing right to Plaintiffs' mortgage. The Defendant rights to Plaintiffs' "Property" are only as good as the rights of previous successor lender, and any liens or security interest may be voided.

46.     Plaintiffs are informed and threon allege that the "note" in this case was never properly transferred and delivered by U.S. Bank to the depositor, and by the depositor to the custodian on behalf of the trustee for the trust prior to its original closing date, therefore if in fact valid, U.S. Bank was still not party to or beneficiary of the assignment pursuant to New York trust laws, under which a statute provides that every conveyance or other trustee's act in contravention of the trust is void.

47.     Plaintiffs are not disputing the validity of the deed of trust itself, nor are they claiming that the mortgage does not exist. Plaintiffs simply asking who lawfully owns their mortgage and disputes Defendants' claims in the promissory note and thus any assignments.

## FIRST CAUSE OF ACTION – INJUNCTIVE AND DECLARATORY RELIEF
### (Pursuant to A.R.S. §§ 33-801(1) – 801(10))

48.     Allegations contained in Paragraphs 1 – 47 of this complaint are realleged and incorporated herein by this reference.

49.     Plaintiffs allege that pursuant to Arizona's recording statute A.R.S. 33-420 the Defendants have misrepresented recorded instruments that are material, and the putative beneficiary is not, in fact, the true beneficiary for the purpose of anti-deficiency protection. *Sitton v. Deutsche bank Nat. Trust Co.*, 233 Ariz. 215, 244 n.6 at 33, 311, P.3d 237, 266 n.6 (App. 2013)

50.     Hereby Plaintiffs as Trustors file an action to set aside the trustee sale on the grounds that notice of substitution of trustee was defective, as supported in the Supreme Court decision in *Eardley v. Greenberg*, 164 Ariz. 261, 792 P.2d 724 (1990)

51.     This Court has the authority to grant a preliminary injunction because Plaintiffs allege sufficient facts under a cognizable legal theory for this Court to grant a preliminary injunction, and declare that Plaintiffs' interests are superior to the interest of the Defendants, and any liens or interest on title of Defendants and any subsequent mortgage assignments and rents may be avoided.

## SECOND CAUSE OF ACTION – BREACH OF CONTRACT
### (Pursuant to Torts § 323)

52.     Allegations contained in Paragraphs 1 – 51 of this complaint are realleged and incorporated herein by this reference.

53.     Arizona recognizes a cause of action for negligent performance of an undertaking as it is summarized in the Restatement (Second) of Torts.

54.     Plaintiffs believe and thereon allege that Defendants undertook, gratuitously or for consideration, to render services for loan modification needed to offer protection of their credit worthiness and financial stability, and are subject to liability for economic harm resulting in failure to exercise reasonable care to perform their undertaking.

55.     Plaintiffs allege that Defendants have never truly considered, or brought before the true investor, or even U.S. Bank a viable loan modification offer for them to sign or to execute, thereon exposing itself to breach of implied contract and breach of good faith undertaking and dealing.

56.     Plaintiffs allege that under Torts § 323 Defendants are subject to Plaintiffs claims alleging increased risk of economic harm, loss of use of home.

57.     Plaintiffs were unlawfully forced from their home, had to rent an apartment from friends for the time period that the Defendants recognized their mistake and reversed the first foreclosure but yet failed to notify Plaintiffs of the correction only causing more economic harm.

58.     In undertaking of a loan modification Defendants should recognize protections necessary for the wellbeing of the Plaintiffs. Defendants knew of the mistake in the first foreclosure and evicted homeowners about the same time that the erroneous recording of assignment has taken place.

59.     Defendants failed to exercise reasonable care and by doing so exposed the Plaintiffs to economic and psychological harm because the Defendants via their agents knowingly and intentionally failed to sign on the loan modification, or failed to allow U.S. Bank sign the final loan modification, causing the Plaintiffs to be evicted from their home.

60.     Plaintiffs allege that they were in fact, and directly harmed by the Defendants' actions or failure to perform.

## THIRD CAUSE OF ACTION – NEGLIGENCE PER SE
### (Pursuant to A.R.S. § 39-161)

61.     Allegations contained in Paragraphs 1 – 60 of this complaint are realleged and incorporated

herein by this reference.

62.    Plaintiffs allege that the signatures of the signors of the purported assignment of deed of trust, substitution of trustee sale and notice of trustee sale contain false and unauthorized signatures, and in allowing documents to be recorded at the County Recorder, which contain false and unauthorized signatures, Defendants violated A.R.S. § 39-161.

63.    Furthermore Plaintiffs allege that the Defendants violated A.R.S. § 41-312 and 41-313 because the signatures were never witnessed by the notaries, confirming the authority, or even notarized on the same day signed by the signors.

64.    Pursuant to A.R.S. § 39-161 Defendants violations are a class 6 felony and constitute negligence per se.

65.    As alleged and outlined in the general allegations of this complaint and supported by facts stated, Plaintiffs have suffered and will suffer further damages due to negligence per se of the Defendants.

66.    Plaintiffs allege that the provision under A.R.S. § 39-161 secure the Plaintiffs quiet enjoyment rights and privileges under performance of service, and Plaintiffs are entitled for damages already suffered while they were forced to live out of their home.

## FORTH CAUSE OF ACTION – PAYMENT OF DEBT
### (Pursuant to A.R.S. § 47-3604(A)(1))

67.    Allegations contained in Paragraphs 1 – 66 of this complaint are realleged and incorporated herein by this reference.

68.    Plaintiffs believe and upon such belief allege that pursuant to A.R.S. § 47-3602, and the common law, payment of the amount due under the note by insurance, the FDIC under the

shared-loss agreement, or by any other individual or entity, is payment of the obligation on behalf of the Plaintiffs. Accordingly, the Plaintiff's obligation under the Note is discharged to the extent of any payment received by OneWest Bank, any predecessor in interest, or any successor in interest, on the note.

69.    Furthermore, pursuant to A.R.S. § 47-3601, the obligation of the Plaintiffs on the Note is discharged, to the extent of any payments received pursuant to the Note, by any Defendant, individual or entity.

70.    Plaintiffs argue that the provisions of A.R.S. § 47-3101 apply to A.R.S. § 33-801 et seq. *See G.E. Capital Mortg. Servs. Inc v. Neely*, 135 N.C. App. 187, 191 519 S.E.2d 553, 556 (N.C. Ct. App 1999)

## FIFTH CAUSE OF ACTION – CANCELLATION OF INSTRUMENTS
### (Pursuant to A.R.S. § 33-420 (A) and (B))

71.    Allegations contained in Paragraphs 1 – 70 of this complaint are realleged and incorporated herein by this reference.

72.    Plaintiffs believe and upon such belief allege that the assignments purported by OneWest Bank contain unauthorized signatures of the signatory, Suchan Murray as assistant vice president for MERS. Plaintiffs believe and upon such belief contend that due to the unlawful assignment of the deed of trust the subsequent notice of trustee sale is void.

73.    Furthermore Plaintiffs point out that the timing of the assignments itself does not give OneWest Bank lawful beneficiary interest in the deed of trust at the time notice of trustee was executed nor does it give the purported beneficiary the lawful power of attorney to appoint a substitution trustee.

74.     Plaintiffs alleges and upon such contends that there cannot be a valid transfer of interest is the subject property to OneWest or U.S. Bank

75.     The second assignment dated March 21st, 2012 from OneWest Bank to US Bank, although somewhat attempts to correct the deficiencies created by the first assignment dated September 9th, 2009 is still lacks to give US Bank the security interest in the subject property and the lawful authority to exercise a non-judicial foreclosure right, because OneWest Bank never lawfully acquired the beneficiary interest, regardless that it was backdated by Perry & Shapiro LLP by a period of 4 months to look like OneWest Bank had the lawful authority to foreclose in September 22nd, 2010.

76.     Arizona Revised Statute § 33-420 (A) provides that [a] person purporting to claim a interest in, or lien or encumbrance against, real property, who causes a document asserting such claim to be recorded in the office of the country recorder, knowing or having reason to know that the document is forged, groundless, or contains material misstatement or false claim or is otherwise invalid is liable to the owner or the beneficial title holder of the real property for a sum of not less than five thousand dollars, or for treble the actual damages caused by the recording, whichever is greater, and reasonable attorney fees and costs of the action.

77.     Plaintiffs argue that the recorded documents are liens and/or assert interest in the Plaintiffs property and therefore support their claim against the Defendants under to ARS § 33-420 (A) and (B).

78.     Defendants, by virtue of rights following the sale of the note, do not hold a valid security interest in the note, and rights to the deed of trust via the purported assignment of mortgage/deed of trust.

**WHEREFORE**, Plaintiffs respectfully pray for judgment against the Defendants, its agents or employees, jointly and severally, as follows:

a. For a declaration of breach of contract under mortgage servicing rules, the rights and duties of the parties, specifically trustees obligation and fiduciary duties to give proper notices and alternatives to foreclosure;

b. For a declaration that discharge of debt under the shared-loss agreement

c. For issuance of an Order cancelling the Assignment of Deed of Trust, and Notice of Trustee Sale;

d. To vacate and/or set aside the foreclosure sale;

e. For compensatory, special and general damages in an amount according to proof at trial;

f. For recovery of damages for negligent performance of an undertaking, and economic harm under the alleged modification program;

g. For punitive damages in an amount to be determined by the Court against the Defendants;

h. For civil penalties pursuant to statue and restitution;

i. For reasonable cost of suit; and

j. For such other relief the Court deems proper.

RESPECTFULLY SUBMITTED this 20th day of March, 2014

Hugh Gerald Buffington
*Plaintiffs in Pro Se*

Terry L. Behrens,

## VERIFICATION

We, Hugh Gerald Buffington and Terry L. Behrens ("Plaintiffs"), under penalty of perjury, state, that we are party to the above-entitled litigation, that we have read the attached Verified Complaint and know the contents therein, and the matters and things stated therein are true and correct to the best of our knowledge, information and belief.

DATED this 20th day of March, 2014

Hugh Gerald Buffington          Terry L. Behrens,
*Plaintiffs in Pro Se*

## CERTIFICATE OF SERVICE

ORIGINAL filed in person this 20th day of March, 2014 with:

**Clerk of the United States District Court**
**Sandra Day O'Connor Courthouse**
**401 W. Washington Street**
**Phoenix, AZ 85003**

A copy of the foregoing mailed on or after March 20th, 2014 via USPS certified mail to:

**U.S. Bank N.A.**
**c/o OneWest Bank**
**888 E Walnut Street**
**Pasadena, CA 91101**

**Ocwen Loan Servicing LLC**
**PO Box 24738**
**West Palm Beach, FL 33416**

201108827748
20060972135

# EXHIBIT A

THE FOLLOWING DESCRIBED REAL PROPERTY SITUATE IN THE CITY OF PHOENIX, COUNTY OF MARICOPA, AND STATE OF ARIZONA, TO WIT:

THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 19, TOWNSHIP 7 NORTH, RANGE 3 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT THE EAST 145.00 FEET THEREOF;

TAX ID #: 202-25-261-B

BY FEE SIMPLE DEED FROM HUGH GERALD BUFFINGTON, A SINGLE MAN AS SET FORTH IN INSTRUMENT NO. 20060156328 AND RECORDED ON 2/2/2006, MARICOPA COUNTY RECORDS.

THE SOURCE DEED AS STATED ABOVE IS THE LAST RECORD OF VESTING FILED FOR THIS PROPERTY. THERE HAVE BEEN NO VESTING CHANGES SINCE THE DATE OF THE ABOVE REFERENCED SOURCE.

24 MONTH CHAIN

BY FEE SIMPLE DEED FROM EDWARD J. CARDONA, A SINGLE MAN TO HUGH GERALD BUFFINGTON, A SINGLE MAN AS SET FORTH IN INSTRUMENT NO. 15-0788047, AND RECORDED 2/15/2005, MARICOPA COUNTY RECORDS.

BY FEE SIMPLE DEED FROM DANIEL S. SHELL, WHI ACQUIRED TITLE AS DANIEL STEARNS SHELL, AND LEZLIA A. SHELL, HUSBAND AND WIFE TO EDWARD J. CARDONA, A SINGLE MAN AS SET FORTH IN FILE NO. 02-12255466, AND RECORDED 11/26/2002, MARICOPA COUNTY RECORDS.

Unofficial Document

U32741223-010P24
DEED OF TRUST
LOAN# T0610039-ES0317217
US Recordings

http://recorder.maricopa.gov/cert.aspx?id=54765 [20060972135] 25 Pages

# Exhibit B

# Exhibit B

**FILE COPY**

April 20, 2010

[Sent USPO, Registered Mail, Return Receipt Requested]

IndyMac Mortgage Services, a division of OneWest Bank, FSB
Mailcode: IndyMac-5
2900 Esperanza Crossing
Austin, TX. 78758

RE:    Mortgage Modification
       Loan # 3002336299
       Hugh Gerald Buffington and Terry L Behrens

**Department Manager – Loan Service Department;**

Hereinafter "We" references the subject Borrowers [Hugh Buffington and Terry Behrens].  The referenced Mortgage Modification process [hereinafter referenced as "Modification"] has now aged nearly 9 months.  IndyMac has to date sent us two [2] different sets of Modification documents.  The 2nd set of Modification documents had less favorable terms and conditions. We have not received IndyMac's authorized signatory executed Modification documents for either of the two [2] Modifications.

It appears that IndyMac sold our loan to an INVESTOR during [or after] our negotiations on the lst set of Modification documents.  We suspect that IndyMac's Modification documents for the lst Modification were intentionally not executed by IndyMac.  We have not received any written notice of the assignment of our loan to a 3rd party [INVESTOR].  We believe that the 3rd party and/or IndyMac is legally obligated to provide us with written notice of the assignment of our loan.

IndyMac's legal disclosure requirements to Borrowers may be subject to compliance review by various state and federal regulatory agencies.  We will be researching the disclosure requirements for an Arizona mortgage modification.

We regard the Modification as unresolved.  Phone calls to date about the Modification have resulted in conflicting information from IndyMac.  We do not feel comfortable with IndyMac's phone communications.

From this point forward we will respond only to written correspondence from IndyMac. We will send our responses to IndyMac by USPO Registered Mail, Return Receipt Requested or by receipt acknowledgement by UPS or FEDEX.  IndyMac written responses to us must be timely.  A ten [10] Business Day IndyMac response is a reasonable business practice definition of "timely".

The last telephone conversation we had with IndyMac was with a Supervisor who identified himself as *Desmond*. He informed us that we did not need a copy of the FINAL 2nd set of Modification documents signed [executed] by IndyMac. Desmond stated that the Modification documents were completed [executed] and that the Modification was in place.

Desmond's latest response is unsatisfactory.  We do not have a copy of the 2nd set of Modification documents with an authorized IndyMac officer signature detailing the FINAL terms & conditions.  It is

our legal right to have a certified copy of the Modification documents as evidence of a binding legal contract.

The following quote is from the 2nd set of Modification documents that we signed and sent back on the 15th of February 2010. *"The Loan Documents will NOT be modified unless and until we receive from the Lender a copy of the Agreement SIGNED by the Lender."*

Desmond told us that sometimes the INVESTOR may NEVER send back the executed Modification documents and even if the INVESTOR does send the Modification documents back it could be as long as 3 months.  We have not received any notice of the assignment of our loan to a 3rd party [INVESTOR].  We believe that the 3rd party and/or IndyMac is legally obligated to provide us with written notice of the assignment of our loan.

Desmond refused to give us any INVESTOR information.  He indicated that the INVESTOR uses IndyMac as the Borrower contact.  According to Desmond the INVESTOR doesn't want to be bothered with Borrower phone calls.

The 2nd set of Modification documents that we signed and sent back on the 15th of February, 2010 had a place for the Lender's Signature and identified the Lender as IndyMac Mortgage Services.  There was no reference to an INVESTOR.

We asked Desmond to sign the 2nd set of Modification documents and send us executed copies, <u>Dated and Signed</u>. Desmond stated that he would not send us the executed Modification documents.

The Modification documents also stated that once the Modification was complete ANY late charges would be wiped out and we would start with a clean slate upon approval.  A subsequent phone call to IndyMac for verification disclosed we had been assessed late charges of over $ 400 Dollars, but yet according to Desmond the Modification was completed.

Below are Discussion Points of Interest regarding the IndyMac Modification process.

- Started the Loan Modification back in August of 2009.

- 1st of 3 Temporary Payments started on October 1, 2009.

- Temporary payments were supposed to end on December 31, 2009

- When we asked if the temporary payment schedule would ruin our credit we were told NO, if the Modification was approved.

- We were told to make 3 temporary payments ON TIME and for the approved amount and then if we were approved the Modification would be complete.

- Subsequent to the temporary payment arrangement IndyMac provided delinquent payment reporting to the Credit Bureaus.

- Our Credit Card Companies started raising our interest rates and lowering the limits on our Credit Cards. When we called the Credit Card Companies and asked about their actions on our credit lines we were told that IndyMac was reporting us as 60+ days late and they had to act on that reporting.

- We called IndyMac and asked again about the Modification ruining our credit and they told us IndyMac had to report it that way because we were not making our full payment, so technically we were late every month that we made a temporary payment. This response was not what we were originally told about the temporary payments' impact on our Credit Bureau reports.

- We sent the 1st Modification documents back to IndyMac Mortgage Services and waited for a response. After a substantial delay we received an envelope and assumed it was the 1st set of Modification documents with an IndyMac signature on them but instead it was a NEW [2nd] packet of Modification documents. The 2nd Modification adversely changed the terms & conditions of the 1st packet of Modification Documents we had already signed.

- During our Modification process the neighbor next door went through Foreclosure on his home. IndyMac was the Lender. The home sold at Auction to IndyMac for a little over $205,000. The house was originally appraised for $590,000 in 2007. IndyMac resold the house for $ 260,000.

- The principal balance of the IndyMac loan on our house is over $ 500,000. IndyMac's sale of the house next door to us has effectively reduced the comps that would be used to value our house in the current market. IndyMac's refusal to lower the Principal balance & monthly payments on our loan doesn't make business sense based on the results of the IndyMac foreclosure and resale of our neighbor's house.

With this letter we are again requesting fully executed FINAL Modification documents. The Modification documents must be CERTIFIED COPIES. We also request CERTIFIED COPIES of the Original Promissory Note and Mortgage. Without these copies we consider all Modifications proposed to date by IndyMac as null and void and we request a renegotiation of the terms and conditions of a new Modification agreement.

If we do not have a satisfactory written response within ten [10] business days of IndyMac's receipt of this letter we will consider retaining an attorney who is familiar with IndyMac's mortgage servicing & documentation process. The attorney retained will be in addition to the legal services firm detailed below.

Respectfully,

Hugh Gerald Buffington    *signature*    Date: 4/20/10

Terry L Behrens    *signature*    Date: 4/20/10

cc:    ARIZONA DEPARTMENT OF FINANCIAL INSTITUTIONS
       PREPAID LEGAL SERVICES, INC.

# Exhibit C

# Exhibit C

Execution Copy

## SHARED-LOSS AGREEMENT

This SHARED-LOSS AGREEMENT (this "Agreement") is made and entered into as of the 19th day of March, 2009 by and between the FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC FEDERAL BANK, FSB (the "Receiver") and OneWest Bank, FSB (the "Purchaser"). The terms hereof shall modify and supplement, as necessary, the terms of the Loan Sale Agreement between the Receiver and the Purchaser of even date herewith (the "LSA"), to which this Agreement is attached as an Exhibit. To the extent any inconsistencies may arise between the terms of the LSA and this Agreement with respect to the subject matter of this Agreement, the terms of this Agreement shall control. References in this Agreement to a particular Section shall be deemed to refer to a Section in this Agreement, unless the context indicates that it is intended to be a reference to a Section of the LSA.

### ARTICLE I – DEFINITIONS

The capitalized terms set forth below, as used in this Agreement, shall have the following meanings. Capitalized terms that are not otherwise defined herein are used as defined in the LSA.

"**Accounting Records**" means the subsidiary system of record on which the loan history and balance of each Shared-Loss Loan is maintained; individual loan files containing either an original or copies of documents that are customary and reasonable with respect to loan servicing, including management and disposition of other real estate; the records documenting alternatives considered with respect to loans in default or for which a default is reasonably foreseeable; records of loss calculations and supporting documentation with respect to line items on the loss calculations; and monthly delinquency reports and other performance reports customarily utilized by the Purchaser in management of loan portfolios.

"**Accrued Interest**" means, with respect to Shared-Loss Loans, the amount of earned and unpaid interest at the note rate specified in the applicable loan documents, limited to 90 days.

"**Charged-Off Loan**" means a Shared-Loss Loan that is fully charged off in accordance with the policies and procedures of IndyMac Federal Bank, FSB in effect as of January 2, 2009 (or as may be modified thereafter with the consent of the Receiver) and applicable regulatory requirements and guidelines. Notwithstanding the foregoing, no Shared-Loss Loan that is charged off as contemplated in the foregoing sentence will be considered a Charged-Off Loan until the loan is first processed under the Program, unless such loan is not a Qualifying Loan or unless the Purchaser is not permitted to apply the Program under applicable law.

"**Charge-Off Loss**" means the loss on a Charged-Off Loan calculated in accordance with applicable regulatory requirements and guidelines, limited as to the amount of includable Accrued Interest and other costs as indicated in Exhibit 2e.

"**Commencement Date**" means the Closing Date.

"**Cumulative Loss Amount**" means the sum of the Monthly Loss Amounts.

"**Cumulative Shared-Loss Amount**" means the excess, if any, of the Cumulative Loss Amount over the First Loss Amount.

"**Customary Servicing Procedures**" means, with respect to a Shared-Loss Loan, the procedures that the Purchaser customarily employs and exercises in servicing and administering mortgage loans for its own accounts and the servicing procedures established by Fannie Mae or Freddie Mac, which are in accordance with accepted mortgage servicing practices of prudent lending institutions.

"**FDIC**" means the Federal Deposit Insurance Corporation in its corporate capacity.

"**Final Shared-Loss Month**" means the earlier of (i) the calendar month in which the tenth anniversary of the Commencement Date occurs and (ii) the calendar month in which a Portfolio Sale occurs.

"**First Loss Amount**" means the dollar amount equal to the product of (i) 0.20 multiplied by (ii) the aggregate unpaid principal balance of the Shared-Loss Loans as shown on the Loan Schedule attached to the LSA as Attachment A, as updated as of the Closing Date in accordance with Section 2.06 of the LSA, which dollar amount represents the total amount of Losses on Shared-Loss Loans the Purchaser has agreed to realize before the Receiver is required to make payments to the Purchaser with respect to Shared-Loss Loans pursuant to Section 2.1(d) of this Agreement.

"**Foreclosure Loss**" means the loss realized when the Purchaser has completed the foreclosure on a Shared-Loss Loan and realized final recovery on the collateral through liquidation and recovery of any insurance proceeds. Each Foreclosure Loss shall be calculated in accordance with the form and methodology specified in Exhibit 2a.

"**Guidelines**" means the Statement on Loss Mitigation Strategies for Servicers of Residential Mortgages (September 2007), issued by the federal financial institutions regulatory agencies and the Conference of State Bank Supervisors, the Statement on Working with Mortgage Borrowers (April 2007), issued by the federal financial institutions regulatory agencies, the Home Equity Line of Credit Account Management Guidance (August 2008), issued by the Office of Thrift Supervision, and the Program, each as may be amended or supplemented from time to time.

"**Independent Accounting Firm**" means a nationally recognized certified public accounting firm selected by the Purchaser and approved by the Receiver (including approval by the Receiver of the engagement terms of such firm), which approval shall not be unreasonably withheld.

"**Loan Sale Loss**" means the loss realized by the Purchaser upon the sale of a Shared-Loss Loan by the Purchaser to an unaffiliated person or entity with the Receiver's consent as set forth in Section 2.6. For Shared-Loss Loans that are not Restructured Loans, Loan Sale Loss will be calculated as the unpaid principal balance of the Shared-Loss Loan less the net sale price received by the Purchaser for the Shared-Loss Loan. Loan Sale Loss for any Restructured Loan will be calculated as (a) the net sale price received by the Purchaser for the Shared-Loss Loan less (b) the net present value of estimated cash flows on the Restructured Loan that was used in

2

the calculation of the related Restructuring Loss <u>plus</u> (c) Loan principal payments collected by the Purchaser from the date the Loan was restructured to the date of sale. (See <u>Exhibit 2d</u> for example calculation).

"<u>Loss</u>" means a Foreclosure Loss, Restructuring Loss, Short Sale Loss, Portfolio Loss, Loan Sale Loss, Charge-Off Loss, excluding any consequential, special or indirect damages, lost profits, lost investment or business opportunity, interest (except as expressly set forth in this Agreement), damages to reputation, punitive damages, exemplary damages, treble damages, nominal damages and operating losses.

"<u>Monthly Certificate</u>" has the meaning provided in <u>Section 2.1(b)</u> of this Agreement.

"<u>Monthly Loss Amount</u>" means the sum of all Losses for any Shared-Loss Month.

"<u>Monthly Shared-Loss Amount</u>" means the change in the Cumulative Shared-Loss Amount from the beginning of each month to the end of each month.

"<u>Portfolio Loss</u>" means the loss realized on the Portfolio Sale of the remaining Shared-Loss Loans calculated in accordance with the terms of <u>Article IV</u>.

"<u>Portfolio Sale</u>" has the meaning provided in <u>Section 4.1</u> of this Agreement.

"<u>Program</u>" means any of the following mortgage loan modification programs: (a) for modifications currently in process or initiated within the first 90 days following the signing of this Agreement, the modification program previously approved by the Board of Directors of IndyMac Federal Bank, FSB in Conservatorship; (b) the FDIC's Mortgage Loan Modification Program, a copy of which is set forth in <u>Exhibit 5</u> to this Agreement; and (c) any other modifications either to an individual or to a group of borrowers, with prior written consent of the FDIC.

"<u>Qualifying Loan</u>" means a Shared-Loss Loan (i) secured by collateral that is owner-occupied on which the mortgagee has a first priority lien and (ii) with respect to which either (x) the borrower is at least 60 days delinquent or (y) a default is reasonably foreseeable.

"<u>Receiver Recoveries</u>" means the amount of shared Recovery Amounts due to the Receiver, which amount is calculated at the same percentage at which the related Loss was reimbursed by the Receiver.

"<u>Recovery Amount</u>" means, with respect to any period prior to the Termination Date, the amount of collected funds received by the Purchaser that (i) are collected from a borrower or other third-party in respect of a foreclosed Loan subsequent to the reimbursement of the Purchaser by the Receiver for a Foreclosure Loss in respect of such Loan, (ii) are collected from a borrower or other third-party in respect of a Charged-Off Loan subsequent to the reimbursement of the Purchaser by the Receiver for a Charge-Off Loss in respect of such Loan, (iii) are gains realized from a <u>Section 4.1</u> or <u>Section 4.2</u> sale of Shared-Loss Loans for which the Purchaser has previously received a Restructuring Loss payment from the Receiver, or (iv) are received from any source other than as described in clauses (i), (ii) or (iii) above in respect of any Shared-Loss Loan subsequent to the reimbursement of the Purchaser by the Receiver for a

3

Loss in respect of such Loan which represents a payment under any insurance, guaranty or similar arrangement.

"**Restructuring Loss**" means the loss on a modified or restructured loan measured by the difference between (a) the principal, Accrued Interest, unreimbursed Advances and third party fees due on a loan prior to the modification or restructuring and (b) the net present value of estimated cash flows on the modified or restructured loan, discounted at the Then-Current Interest Rate. Each Restructuring Loss shall be calculated in accordance with the form and methodology specified in Exhibits 2b(i) and 2b(ii) and shall be measured after taking into account all subsidies or other payments received by the Purchaser that are intended to be for the benefit of the borrower with respect to such modified or restructured loan under any government-sponsored program affecting the Shared-Loss Loans.

"**Restructured Loan**" means a Shared-Loss Loan for which the Purchaser has received a Restructuring Loss payment from the Receiver.

"**Servicing Officer**" has the meaning provided in Section 2.1(b) of this Agreement.

"**Shared-Loss Loans**" means the Loans identified on the Loan Schedule attached to the LSA as Attachment A.

"**Shared-Loss Month**" means each calendar month between the Commencement Date and the last day of the Final Shared-Loss Month, provided that, the first Shared-Loss Month shall begin on the Commencement Date and end on the last day of that month.

"**Short-Sale Loss**" means the loss resulting from the Purchaser's agreement with the mortgagor to accept a payoff in an amount less than the balance due on the loan. Each Short-Sale Loss shall be calculated in accordance with the form and methodology specified in Exhibit 2c.

"**Stated Threshold**" means the dollar amount equal to the product of (i) 0.30 multiplied by (ii) the aggregate unpaid principal balance of the Shared-Loss Loans as shown on the Loan Schedule attached to the LSA at Attachment A, as updated as of the Closing Date in accordance with Section 2.06 of the LSA.

"**Termination Date**" means the last day of the Final Shared-Loss Month.

"**Then-Current Interest Rate**" means the most recently published Freddie Mac survey rate for 30-year fixed-rate loans or, if such Freddie Mac survey rate is not available, then another comparable nationally published rate for 30-year fixed-rate loans.

## ARTICLE II – SHARED-LOSS ARRANGEMENT

2.1    **Shared-Loss Arrangement**.

(a)    Loss Mitigation and Consideration of Alternatives. For each Shared-Loss Loan in default or for which a default is reasonably foreseeable, the Purchaser shall undertake, or shall use reasonable best efforts to cause third-party servicers to undertake, reasonable and

4

customary loss mitigation efforts in compliance with the Guidelines and Customary Servicing Procedures. The Purchaser shall document its consideration of foreclosure, loan restructuring (if available), charge-off and short-sale (if a short-sale is a viable option and is proposed to the Purchaser) alternatives and shall select the alternative that is reasonably estimated by the Purchaser to result in the least Loss. The Purchaser shall retain all analyses of the considered alternatives and servicing records and allow the Receiver to inspect them upon reasonable notice.

(b)     Monthly Certificates.  Not later than fifteen (15) days after the end of each Shared-Loss Month, beginning with the month in which the Commencement Date occurs and ending with the Final Shared-Loss Month, the Purchaser shall deliver to the Receiver a certificate, signed by an officer of the Purchaser involved in, or responsible for, the administration and servicing of the Shared-Loss Loans whose name appears on a list of servicing officers furnished by the Purchaser to the Receiver (a "Servicing Officer"), setting forth in such form and detail as the Receiver may reasonably specify (a "Monthly Certificate"):

      (A)     a schedule substantially in the form of Exhibit 1A listing:

           (i)     each Shared-Loss Loan for which a Loss is being claimed, the related Loss amount for each Shared-Loss Loan, and the total Monthly Loss Amount for all Shared-Loss Loans;

           (ii)     the Cumulative Shared-Loss Amount as of the beginning and end of the month;

           (iii)     the Monthly Shared-Loss Amount;

           (iv)     the result obtained in clause (v) multiplied by 80%, which is used to compute the amount to be paid by the Receiver or the Purchaser, as applicable, under Section 2.1(d) of this Agreement, or the result in clause (v) multiplied by 95%, if the Stated Threshold has been met;

           (v)     the amount of Receiver Recoveries based on the calculations in Exhibit 1B, listing each loan for which a recovery was received during the month and the Recovery Amount, with the amount of Receiver Recoveries calculated at the same percentage at which the related Loss was reimbursed by the Receiver; and

           (vi)     the net amount due from the Receiver after deducting the amount of Receiver Recoveries from the amount of reimbursable Losses due to the Purchaser.

      (B)     for each of the Shared-Loss Loans for which a Loss is claimed for that Shared-Loss Month, a schedule showing the calculation of the Loss Amount using the form and methodology shown in Exhibit 2a, Exhibit 2b(i), Exhibit 2b(ii), Exhibit 2c, or Exhibit 2e, as applicable.

(C)     for each of the Restructured Loans where a gain or loss is realized in a sale under <u>Section 4.1</u> or <u>Section 4.2</u>, a schedule showing the calculation using the form and methodology shown in <u>Exhibit 2d</u>.

(D)     a portfolio performance and summary schedule substantially in the form shown in <u>Exhibit 3</u>.

(c)     <u>Monthly Data Download</u>.  Not later than fifteen (15) days after the end of each month, beginning with the month in which the Commencement Date occurs and ending with the Final Shared-Loss Month, the Purchaser shall provide the Receiver:

(i)     the servicing file in machine-readable format including but not limited to the following fields for each outstanding Shared-Loss Loan, as applicable:

(A)     Loan number
(B)     FICO score
(C)     Origination date
(D)     Original principal amount
(E)     Maturity date
(F)     Paid-to date
(G)     Last payment date
(H)     Loan status (bankruptcy, in foreclosure, etc.)
(I)     Delinquency counters
(J)     Current principal balance
(K)     Current escrow account balance
(L)     Updated value
(M)     Updated valuation date
(N)     Interest rate
(O)     Monthly principal and interest payment amount
(P)     Monthly escrow payment for taxes and insurance
(Q)     Interest rate type (fixed or adjustable)
(R)     If adjustable: index, margin, next interest rate reset date
(S)     Payment/Interest rate cap and/or floor
(T)     Underwriting type (Full doc, Alt Doc, No Doc)
(U)     Lien type (1st, 2nd)
(V)     Amortization type (amortizing or I/O, neg am or HELOC revolver)
(W)     Property address, including city, state, zip code
(X)     A code indicating whether the Mortgaged Property is owner-occupied
(Y)     Property type (single-family detached, condominium, duplex, etc.)
(Z)     Negative amortization cap
(AA)    Loan type

6

(ii)     An Excel or similar file for real property held as a result of foreclosure on a Shared-Loss Loan listing:

    (A)     Foreclosure date
    (B)     Unpaid loan principal balance
    (C)     Appraised value or BPO value, as applicable
    (D)     Projected liquidation date

(d)     <u>Payments With Respect to Shared-Loss Loans</u>.

(i)     <u>Losses Under the Stated Threshold</u>.  Not later than thirty (30) days after the end of each calendar quarter, the Receiver shall pay to the Purchaser, in immediately available funds, an amount equal to eighty percent (80%) of the sum of the Monthly Shared-Loss Amounts reported on the Monthly Certificates received by the Receiver with respect to such calendar quarter, less the sum of the Receiver Recoveries reported on the Monthly Certificates (provided that the Purchaser has delivered all of such Monthly Certificates to the Receiver within fifteen (15) days after the end of such calendar quarter).  If any Monthly Certificates with respect to a calendar quarter are delivered more than fifteen (15) days after the end of such calendar quarter but within fifteen (15) days after the end of any subsequent calendar quarter, such delayed Monthly Certificates shall be included in the calculation of the sum of Monthly Shared-Loss Amounts and Receiver Recoveries for such subsequent calendar quarter.  If the sum of the total Receiver Recoveries exceeds the sum of the Losses reimbursable by the Receiver as reported on such Monthly Certificates, the Purchaser shall pay to the Receiver, in immediately available funds no later than thirty (30) days after the end of such calendar quarter, an amount equal to such excess.  To the extent that either the Receiver or the Purchaser does not make any payment required by this <u>Section 2.1(d)(i)</u> within thirty (30) days following the end of the calendar quarter, any amount not paid shall thereafter accrue interest at LIBOR plus 250 basis points until paid.  For purposes of this Agreement, "LIBOR" shall be as determined in accordance with the Mortgage Loan Master Repurchase Agreement dated as of the date hereof between the Receiver and the Purchaser.

(ii)     <u>Losses in Excess of the Stated Threshold</u>.  From the time that, and for so long as, the Stated Threshold has been met, the loss/recovery sharing percentages shall change from 80/20 to 95/5 and thereafter the Receiver shall pay to the Purchaser, in immediately available funds no later than thirty (30) days after the end of each calendar quarter, an amount equal to ninety-five percent (95%) of the sum of the Monthly Shared-Loss Amounts reported on the Monthly Certificates received by the Receiver during such calendar quarter, less the sum of Receiver Recoveries (provided that the Purchaser has delivered all of such Monthly Certificates to the Receiver within fifteen (15) days after the end of such calendar quarter).  Notwithstanding the foregoing, in the month in which the Cumulative Loss Amount surpasses the Stated Threshold, the portion of the Monthly Shared-Loss Amount up to the Stated Threshold will be paid at 80%, and the portion of the Monthly Shared-Loss  Amount in excess of the Stated Threshold will be paid at 95%.  If any Monthly Certificates with respect to a calendar quarter are delivered more than fifteen (15) days after the end of such calendar quarter but within fifteen (15) days after the end of any subsequent calendar quarter, such delayed Monthly Certificates shall be included in the calculation of the sum of Monthly Shared-Loss Amounts for such subsequent calendar quarter.  If the sum of the total Receiver Recoveries exceeds the sum of the

Losses reimbursable by the Receiver as reported on such Monthly Certificates, the Purchaser shall pay to the Receiver, in immediately available funds no later than thirty (30) days after end of such calendar quarter, an amount equal to such excess.  To the extent that either the Receiver or the Purchaser does not make any payment required by this Section 2.1(d)(ii) within the required thirty (30)-day period, any amount not paid shall thereafter accrue interest at LIBOR plus 250 basis points until paid.

      (e)      <u>Limitations on Shared-Loss Payment</u>.

      (i)      The Receiver shall not be required to make any payments pursuant to Section 2.1(d) with respect to any Loss in the event that the Receiver determines that the Purchaser has not complied with the criteria set forth in this Agreement (including the analysis and documentation requirements of Section 2.1(a), the obligation to adhere to the Customary Servicing Procedures or, with respect to a claimed Restructuring Loss on any Qualifying Loan, the obligation to modify or restructure the loan according to the terms of the Program).  If the Receiver makes such a determination, the Receiver shall promptly provide a written notice to the Purchaser detailing the grounds for such determination.  If the Purchaser disagrees with such determination, it shall promptly provide a written notice (a "Notice of Disagreement") to the Receiver detailing the Purchaser's compliance with the criteria set forth in this Agreement and otherwise detailing the Purchaser's grounds for such disagreement (a "Disagreement").  If the Purchaser demonstrates to the satisfaction of the Receiver, in the Receiver's reasonable judgment, that the grounds for the Receiver's determination were insufficient, no longer exist or have been cured, then the Receiver shall pay the Purchaser the amounts affected by the Receiver's determination within fifteen (15) days after such demonstration by the Purchaser.  In the event that the Receiver is not required to make any payment with respect to any Loss claimed pursuant to Section 2.1(d), the Receiver and the Purchaser shall make the necessary adjustments to the Monthly Shared-Loss Amount(s) for the applicable Monthly Certificate(s) and the payment pursuant to Section 2.1(d) above shall be adjusted accordingly.

      (ii)      If the Purchaser has delivered a Notice of Disagreement, the parties shall promptly commence good faith negotiations with a view to resolving the Disagreement.  If the parties do not resolve the Disagreement within ten (10) Business Days after the delivery of the Notice of Disagreement to the Receiver (with such resolution evidenced by a written agreement signed by the Purchaser and the Receiver), such Disagreement or portion thereof that is not resolved shall be referred by the Purchaser to the Independent Accounting Firm for resolution.  The Purchaser shall provide the Independent Accounting Firm with a copy of this Agreement, the Notice of Disagreement and any supporting documentation that has been exchanged by the parties.  The Independent Accounting Firm shall decide the Disagreement by determining, based solely on the terms of this Agreement and the documents made available to it in accordance with this Section 2.1(e)(ii), whether the Purchaser has complied with the criteria set forth in this Agreement (including the analysis and documentation requirements of Section 2.1(a), the obligation to adhere to the Customary Servicing Procedures or, with respect to a claimed Restructuring Loss on any Qualifying Loan, the obligation to modify or restructure the loan according to the terms of the Program), and shall not determine the amount of such payment.  The Independent Accounting Firm shall issue a written decision, a copy of which shall be provided to each party, setting forth the resolution of the Disagreement.  Such resolution by the Independent Accounting Firm shall be final and binding upon the parties and the parties

expressly acknowledge the foregoing.  The Purchaser and the Receiver shall use their best efforts to cause the Independent Accounting Firm to render its determination as soon as practicable after the referral to it of the Disagreement but in any event shall direct the Independent Accounting Firm to render its decision no later than thirty (30) days after the date on which the Independent Accounting Firm receives all of the information to be provided to it in accordance with this Section 2.1(e)(ii).  The Purchaser and the Receiver each shall cooperate with the Independent Accounting Firm and provide such firm with reasonable access to such Accounting Records and personnel as the Independent Accounting Firm reasonably requests in order to render its determination.  Either the Purchaser and the Receiver may enforce the decision of the Independent Accounting Firm in a court of competent jurisdiction, but neither the Purchaser and the Receiver shall challenge or seek to appeal the decision of the Independent Accounting Firm, and each expressly waives any right it may otherwise have to so challenge such decision.  The fees and expenses of the Independent Accounting Firm shall be shared equally by the Purchaser and the Receiver.  Following the resolution of the Disagreement, the Receiver and the Purchaser shall make the necessary adjustments to the Monthly Shared-Loss Amount(s) for the applicable Monthly Certificate(s) and the payment pursuant to Section 2.1(d) above shall be adjusted accordingly to include or exclude the amount of the claimed Loss in accordance with the decision of the Independent Accounting Firm.

(iii)    Notwithstanding anything to the contrary contained herein, if, at any time after the Receiver makes a payment to the Purchaser pursuant to Section 2.1(d), the Receiver determines that such payment should not have been made because the Purchaser had not complied with the criteria set forth in this Agreement, the Receiver may provide a written notice to the Purchaser detailing the grounds for such determination and requesting that the full amount of such payment be returned to the Receiver.  If the Purchaser disagrees with such determination, it shall promptly submit a Notice of Disagreement to the Receiver detailing the grounds for such Disagreement, and such Disagreement shall be resolved as provided in this Section 2.1(e).  If the Purchaser does not submit a Notice of Disagreement to the Receiver within ten (10) Business Days after receipt of written notice of the Receiver's determination or if the Disagreement with respect to the Receiver's determination is resolved in the Receiver's favor, then, at the sole option of the Receiver, (i) the Receiver may offset the full amount of the payment that was the subject of the Notice of Disagreement against any other payments the Receiver is required to make to the Purchaser pursuant to Section 2.1(d) or (ii) the Purchaser shall, within two (2) Business Days after a request for payment is made by the Receiver, return to the Receiver the full amount of the payment that was the subject of the Notice of Disagreement, and, in either case, the Receiver and the Purchaser shall make any necessary adjustments to all affected Monthly Certificate(s).

(f)    Shared-Loss Payment Clean-up Call.

(i)    At any time after the date on which the aggregate remaining unpaid principal balance of the Shared-Loss Loans is reduced to ten percent (10%) of the aggregate unpaid principal balance of the Shared-Loss Loans as of the Closing Date, the Receiver may make a single election, by giving notice in writing to the Purchaser, to make a final cash payment to the Purchaser in settlement of all remaining obligations owed to the Purchaser under this Agreement.  The amount of such final cash payment shall be equal to the difference between (x) the value of the Shared-Loss Loans applying the shared-loss protection

9

provided for in this Agreement and (y) the value of such Shared-Loss Loans without the shared-loss protection, such values to be determined by taking the average of the valuations provided by two independent third party appraisers who are experienced in the valuation of loans similar to the Shared-Loss Loans, one of whom shall be selected by the Receiver and one of whom shall be selected by the Purchaser. Each party shall bear the costs and expenses of the third party appraiser that it selects. After the Receiver makes such final cash payment to the Purchaser, each party shall be relieved of its obligations under this Agreement.

(ii)    Notwithstanding anything to the contrary in clause (i) above, the Receiver may, in its sole discretion, after review of the valuations provided by the third party appraisers, by written notice to the Purchaser, elect not to make the final cash payment to the Purchaser, and the Receiver shall not have any obligation to cash-settle its remaining obligations and such obligations shall remain in full force and effect. If the Receiver elects not to make the final cash payment to the Purchaser after the valuation of the third party appraisers has been performed, the costs and expenses of such appraisers shall be borne by the Receiver. Within fifteen (15) days after the value of the Shared-Loss Loans is determined in accordance with Section 2.1(f)(i), the Receiver shall either (a) pay to the Purchaser the final cash payment or (b) deliver a notice of its election not to make the final cash payment.

(g)    Payments by Wire-Transfer. All payments under this Agreement shall be made by wire-transfer in accordance with the wire-transfer instructions on Exhibit 4.

## 2.2    Auditor Report; Right to Audit

(a)    Within ninety (90) days after the end of each calendar year during which the Receiver makes any payment to the Purchaser under this Agreement, the Purchaser shall deliver to the Receiver a report signed by its independent public accountants stating that, in the course of their annual audit of the Purchaser's books and records, nothing has come to their attention suggesting that any computations required to be made by the Purchaser during such calendar year pursuant to this Article II were not made by the Purchaser in accordance herewith. In the event that the Purchaser cannot comply with the preceding sentence, it shall promptly submit to the Receiver corrected computations together with a report signed by its independent public accountants stating that, after giving effect to such corrected computations, nothing has come to their attention suggesting that any computations required to be made by the Purchaser during such year pursuant to this Article II were not made by the Purchaser in accordance herewith. In such event, the Purchaser and the Receiver shall make all such accounting adjustments and payments as may be necessary to give effect to each correction reflected in such corrected computations, retroactive to the date on which the corresponding incorrect computation was made.

(b)    Not more than once per calendar quarter, the Receiver or the FDIC may perform an audit or audits to determine the Purchaser's compliance with the provisions of this Agreement, including this Article II, by providing not less than ten (10) Business Days' prior written notice. If the Receiver or the FDIC has given the Purchaser prior notice of an audit in accordance with the preceding sentence, the Purchaser shall provide access to pertinent records and proximate working space in the Purchaser's facilities. The scope of the audit shall be limited to the books and records described in Section 2.3 and shall be of reasonable duration. The

Receiver or the FDIC, as the case may be, shall bear the expense of any such audit.  In the event that any corrections are necessary as a result of such an audit or audits, the Purchaser and the Receiver shall make such accounting adjustments and payments as may be necessary to give retroactive effect to such corrections.

       2.3    **Books and Records.**  The Purchaser shall at all times keep or cause to be kept books and records sufficient to ensure and document compliance with the terms of this Agreement, including but not limited to (a) documentation of alternatives considered with respect to defaulted loans or loans for which default is reasonably foreseeable as set forth in Section 2.1(a), (b) documentation showing the calculation of Loss for claims submitted to the Receiver, (c) retention of documents that support each line item on the Loss claim forms, and (d) documentation with respect to the Recovery Amount on loans for which the Receiver has made a loss-share payment.

       2.4    **Information.**  The Purchaser shall promptly provide to the Receiver such other information, including but not limited to financial statements, computations, and bank policies and procedures, relating to the performance of the provisions of this Agreement, as the Receiver may reasonably request from time to time.

       2.5    **Tax Ruling.**  The Purchaser shall not at any time, without the Receiver's prior written consent, seek to qualify for any special tax treatment or benefits associated with any payments made by the Receiver pursuant to this Agreement.

       2.6    **Sale or Assignment of Shared-Loss Loans.**  The Receiver shall be relieved of its obligations with respect to a Shared-Loss Loan upon payment of a Foreclosure Loss amount, a Short Sale Loss amount or a Charge-Off Loss amount with respect to such Shared-Loss Loan or upon the sale of a Shared-Loss Loan by the Purchaser to an unaffiliated person or entity, provided that, if the Purchaser has received the Receiver's prior written consent to sell a Shared-Loss Loan to an unaffiliated person  or entity (which consent may be granted or withheld in the Receiver's sole discretion), any Loan Sale Loss relating thereto may be included in the calculation of the Monthly Shared-Loss Amount hereunder.  The Purchaser shall provide the Receiver with timely notice of any such sale.  Notwithstanding the foregoing, the Receiver shall not be relieved of its obligations under this Agreement in the case of, and the Purchaser shall be permitted to sell or assign its rights under this Agreement in connection with, (i) any change in the ownership or control of the Purchaser, (ii) a merger by the Purchaser with or into any other entity, (iii) a sale by the Purchaser of all or substantially all of its assets and (iv) any pledge or collateral assignment of rights by the Purchaser of its rights under this Agreement as collateral for any Federal Home Loan Bank financing or other third party financing, or any securitization transaction, with respect to the Shared-Loss Loans that is completed with the prior written consent of the Receiver, which consent shall not be unreasonably withheld provided that there is no monetization by the Purchaser of the assignment of the benefits of this Agreement.  In determining whether to grant consent for any transaction referenced in clause (iv) above, the Receiver will consider the equitable allocation of the economic benefits associated with any proposed assignment of the benefits of this Agreement.

## ARTICLE III – RULES REGARDING THE ADMINISTRATION OF SHARED-LOSS LOANS

**3.1**    **Agreement with Respect to Administration.**  The Purchaser shall (and shall cause any of its Affiliates to which the Purchaser transfers any Shared-Loss Loans or shall use reasonable best efforts to cause any third-party servicer to) manage, administer, and collect the Shared-Loss Loans while owned by the Purchaser or any Affiliate thereof during the term of this Agreement in accordance with the rules set forth in this Article III.  The Purchaser shall be responsible to the Receiver in the performance of its duties hereunder and shall provide to the Receiver such reports as the Receiver reasonably deems advisable, including but not limited to the reports required by Sections 2.1, 2.2 and 3.3 hereof, and shall permit the Receiver to monitor the Purchaser's performance of its duties hereunder.

**3.2**    **Duties of the Purchaser.**

(a)    In performance of its duties under this Article III, the Purchaser shall or shall cause any Affiliate or shall use reasonable best efforts to cause any third-party servicer to:

(i)    manage and, administer each Shared-Loss Loan in accordance with Purchaser's usual and prudent business and servicing practices and Customary Servicing Procedures;

(ii)    exercise its best business judgment in managing, administering and collecting amounts owed on the Shared-Loss Loans;

(iii)    use commercially reasonable efforts to maximize recoveries with respect to Losses on Shared-Loss Loans  without regard to the effect of maximizing collections on assets held by the Purchaser or any of its Affiliates that are not Shared-Loss Loans;

(iv)    retain sufficient staff to perform its duties hereunder; and

(v)    comply with the terms of the Guidelines for any Shared-Loss Loans meeting the requirements set forth therein. Subject to the approval of the FDIC, the Purchaser may propose exceptions to the Program for a group of Loans with similar characteristics, with the objectives of (1) minimizing the loss to the Purchaser and the FDIC and (2) maximizing the opportunity for qualified homeowners to remain in their homes with affordable mortgage payments.

(b)    Any transaction with or between any Affiliate of the Purchaser with respect to any Shared-Loss Loan including, without limitation, the execution of any contract pursuant to which any Affiliate of the Purchaser will manage, administer or collect any of the Shared-Loss Loans, shall be subject to the prior written approval of the Receiver.

**3.3**    **Shared-Loss Asset Records and Reports.**  The Purchaser shall establish and maintain such records as may be appropriate to account for the Shared-Loss Loans to enable the Purchaser to prepare and deliver to the Receiver such reports as the Receiver may reasonably

12

require from time to time regarding the Shared-Loss Loans and the Monthly Certificates required by Section 2.1 of this Agreement.

### 3.4 Related Loans.

(a)     The Purchaser shall use its reasonable best efforts to determine which loans are "Related Loans", as hereinafter defined.  Except as otherwise required by law, the Purchaser shall not manage, administer or collect any "Related Loan" in any manner that would have the effect of increasing the amount of any collections with respect to the Related Loan to the detriment of the Shared-Loss Loan to which such loan is related; provided, that the Purchaser shall not be in breach of this Section 3.4(a) with respect to any actions taken by the Purchaser in compliance with Section 5.20 of the LSA or the Program.  A "Related Loan" means any other loan or extension of credit held by the Purchaser at any time on or prior to the end of the Final Shared-Loss Month that is made to a Borrower under a Shared-Loss Loan and is not a Shared-Loss Loan.

(b)     The Purchaser shall prepare and deliver to the Receiver with the Monthly Certificates for the calendar months ending June 30 and December 31 a schedule of all Related Loans on the Accounting Records of the Purchaser as of the end of each such semi-annual period.

### 3.5 Legal Action; Utilization of Special Receivership Powers.  The Purchaser shall notify the Receiver in writing (such notice to be given in accordance with Article V below and to include all relevant details) prior to utilizing in any legal action any special legal power or right which the Purchaser derives as a result of having acquired an asset from the Receiver, and the Purchaser shall not utilize any such power unless the Receiver shall have consented in writing to the proposed usage. The Receiver shall have the right to direct such proposed usage by the Purchaser and the Purchaser shall comply in all respects with such direction. Upon request of the Receiver, the Purchaser will advise the Receiver as to the status of any such legal action. The Purchaser shall immediately notify the Receiver of any judgment in litigation involving any of the aforesaid special powers or rights.

### ARTICLE IV – PORTFOLIO SALE

### 4.1 Purchaser Portfolio Sale of Remaining Shared-Loss Loans.  The Purchaser shall have the right, subject to the prior written consent of the Receiver, to liquidate for cash consideration all Shared-Loss Loans held by the Purchaser at any time prior to the Termination Date ("Portfolio Sale").  If the Purchaser exercises its option under this Section 4.1, it must give thirty (30) days' prior notice in writing to the Receiver setting forth the details and schedule for the Portfolio Sale which shall be conducted by means of sealed bid sales to third parties, not including any of the Purchaser's Affiliates, contractors, or any Affiliates of the Purchaser's contractors. Sales of Restructured Loans shall be sold in a separate pool from Shared-Loss Loans not restructured.  The Receiver will review the Purchaser's proposed Portfolio Sale in a timely fashion and its prior written consent will not be unreasonably withheld; provided, however, that the Receiver shall be entitled to refuse such consent if the Receiver determines that the Portfolio Loss exceeds an equitable representation of the risk of credit loss on the remaining Shared-Loss Loans.  For the avoidance of doubt, no consent of the Receiver shall be required for a Portfolio

13

Sale with respect to which no Portfolio Loss is claimed, and the Receiver shall be relieved of its obligations under this Agreement with respect to any Portfolio Sale effected without the Receiver's consent.

    **4.2**    <u>**Purchaser Liquidation of Remaining Shared-Loss Loans**</u>.  In the event that the Purchaser does not conduct a Portfolio Sale pursuant to <u>Section 4.1</u>, the Receiver shall have the right, exercisable in its sole and absolute discretion, to require the Purchaser to liquidate for cash consideration, any Shared-Loss Loans held by the Purchaser at any time after the date that is six months prior to the Termination Date.  If the Receiver exercises its option under this <u>Section 4.2</u>, it must give notice in writing to the Purchaser, setting forth the time period within which the Purchaser shall be required to liquidate the Shared-Loss Loans. The Purchaser will comply with the Receiver's notice and must  liquidate the Shared-Loss Loans as soon as reasonably practicable by means of sealed bid sales to third parties, not including any of the Purchaser's Affiliates, contractors, or any Affiliates of the Purchaser's contractors.  The selection of any financial advisor or other third party broker or sales agent retained for the liquidation of the remaining Shared-Loss Loans pursuant to this Section shall be subject to the prior approval of the Receiver, such approval not to be unreasonably withheld, delayed or conditioned.

    **4.3**    <u>**Calculation of  Sale Gain or Loss**</u>.  For Shared-Loss Loans that are not Restructured Loans, gain or loss on the sales under <u>Section 4.1</u> or <u>Section 4.2</u>  will be calculated as the net sale price received by the Purchaser less the unpaid principal balance of the remaining Shared-Loss Loans. For any Restructured Loan sold under <u>Section 4.1</u> or <u>Section 4.2</u>, gain or loss on sale will be calculated as (a) the net sale price received by the Purchaser <u>less</u> (b) the net present value of estimated cash flows on the Restructured Loan that was used in the calculation of the related Restructuring Loss <u>plus</u> (c) Loan principal payments collected by the Purchaser from the date the Loan was restructured to the date of sale. (See Exhibit 2d for example calculation).

## ARTICLE V – LOSS-SHARING NOTICES GIVEN TO RECEIVER AND PURCHASER

    All notices, demands and other communications hereunder shall be in writing and shall be delivered by hand, or overnight courier, receipt requested, addressed to the parties as follows:

If to the Receiver, to:  Manager, Non-Structured Sales and Asset Management
                     c/o Federal Deposit Insurance Corporation
                     550 17th Street, NW (Room F-7014)
                     Washington, D.C.  20429-0002
                     Attention: Ralph Malami

with a copy to:        Senior Counsel
                     FDIC Legal Division
                     Litigation and Resolutions Branch, Receivership Section
                     Special Issues Unit
                     3501 Fairfax Drive (Room E-7056)
                     Arlington, Virginia 22226
                     Attention:  Senior Counsel

With respect to a notice under <u>Section 3.5</u> of this Agreement, copies of such notice shall also be sent to:

> Federal Deposit Insurance Corporation
> Legal Division
> 1910 Pacific Avenue
> Dallas, Texas 75201
> Attention:  Regional Counsel

If to Purchaser, to:   888 East Walnut Street
Pasadena, California 91101-7211
Attention: Steven Mnuchin

with a copy to:   Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attention: Paul E. Glotzer

Such persons and addresses may be changed from time to time by notice given pursuant to the provisions of this <u>Article V</u>.  Any notice, demand or other communication delivered pursuant to the provisions of this <u>Article V</u> shall be deemed to have been given on the date actually received.

## ARTICLE VI – MISCELLANEOUS

**6.1**   **Expenses.**  Except as otherwise expressly provided herein, all costs and expenses incurred by a party hereto in connection with this Agreement shall be borne by such party whether or not the transactions contemplated herein shall be consummated.

**6.2**   **Successors and Assigns; Specific Performance**.  All terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto only; <u>provided</u>, <u>however</u>, that, the Receiver may assign or otherwise transfer this Agreement (in whole or in part) to the FDIC without the consent of the Purchaser.  Notwithstanding anything to the contrary contained in this Agreement, except as is expressly permitted in this <u>Section 6.2</u> or <u>Section 2.6</u>, the Purchaser may not assign or otherwise transfer this Agreement (in whole or in part) without the prior written consent of the Receiver, which consent may be granted or withheld by the Receiver in its sole discretion, and any attempted assignment or transfer in violation of this provision shall be void *ab initio*.

**6.3**   **Governing Law.**  FEDERAL LAW OF THE UNITED STATES SHALL CONTROL THIS AGREEMENT. TO THE EXTENT THAT FEDERAL LAW DOES NOT SUPPLY A RULE OF DECISION, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.  Nothing in this Agreement will require any unlawful action or inaction by either party.

**6.4**   **WAIVER OF JURY TRIAL.**  EACH OF THE PURCHASER, FOR ITSELF AND ITS AFFILIATES, AND THE RECEIVER HEREBY IRREVOCABLY AND

UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

  **6.5** **Captions.** All captions and headings contained in this Agreement are for convenience of reference only and do not form a part of, and shall not affect the meaning or interpretation of, this Agreement.

  **6.6** **Entire Agreement; Amendments.** This Agreement, including the Exhibits and any other documents delivered pursuant hereto, embody the entire agreement of the parties with respect to the subject matter hereof, and supersede all prior representations, warranties, offers, acceptances, agreements and understandings, written or oral, relating to the subject matter herein. This Agreement may be amended or modified or any provision hereof waived only by a written instrument signed by both parties or their respective duly authorized agents.

  **6.7** **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid, illegal or unenforceable under applicable law, such provision shall be construed and enforced as if it had been more narrowly drawn so as not to be prohibited, invalid, illegal or unenforceable, and the validity, legality and enforceability of the remainder of such provision and the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

  **6.8** **No Third Party Beneficiary.** This Agreement and the Exhibits hereto are for the sole and exclusive benefit of the parties hereto and their respective permitted successors and permitted assigns and there shall be no other third party beneficiaries, and nothing in this Agreement or the Exhibits shall be construed to grant to any other person any right, remedy or claim under or in respect of this Agreement or any provision hereof.

  **6.9** **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but such counterparts shall together constitute one and the same instrument.

  **6.10** **Consent.** Except as otherwise provided herein, when the consent of a party is required herein, such consent shall not be unreasonably withheld or delayed.

  **6.11** **Rights Cumulative.** Except as otherwise expressly provided herein, the rights of each of the parties under this Agreement are cumulative, may be exercised as often as any party considers appropriate and are in addition to each such party's rights under the LSA and any of the Related Agreements or under law. Except as otherwise expressly provided herein, any failure to exercise or any delay in exercising any of such rights, or any partial or defective exercise of such rights, shall not operate as a waiver or variation of that or any other such right.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Shared-Loss Agreement to be executed as of the day and year first above written.

**RECEIVER:**

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By: _____
    Name: Ralph Malami
    Title: Manager, Non Structured Sales and
               Asset Management

**PURCHASER:**

ONEWEST BANK, FSB

By: _____
    Name: Joshua P. Eaton
    Title: Authorized Signatory

*Group 5 - Shared-Loss Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Shared-Loss Agreement to be executed as of the day and year first above written.

**RECEIVER:**

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
INDYMAC FEDERAL BANK, FSB

By:_____
   Name:
   Title:

**PURCHASER:**

ONEWEST BANK, FSB

By:_____
   Name: Joshua P. Eaton
   Title: Authorized Signatory