IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

HUGH GERALD BUFFINGTON AND          )
TERRY L. BEHRENS,                   )
                                    )
            Plaintiffs,             )
                                    )   Case No.
v.                                  )   2:14-CV-00615-SRB
                                    )
U.S. BANK, NATIONAL ASSOCIATION     )
as Trustee for Lehman XS Trust      )
Mortgage Pass-Through               )
Certificates, Series 2007-4N;       )
OCWEN LOAN SERVICING, LLC;          )
ONEWEST BANK, F.S.B., INDYMAC       )
MORTGAGE SERVICES, a Division       )
of OneWest; and DOES 1-1000,        )
                                    )
            Defendants.             )
                                    )


DEPOSITION OF U.S. BANK, NATIONAL ASSOCIATION
AS TRUSTEE FOR LEHMAN XS MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2007-4N
FRCP 30(B)(6)

Gina Feezer

Phoenix, Arizona
May 22, 2014
9:58 a.m.


REPORTED BY:
SHELLEY E.D. PEARCE, RPR
Certified Reporter
Certificate No. 50301

PREPARED FOR:


(Copy)

Page 2

I N D E X

WITNESS                                                    PAGE

GINA FEEZER

        Examination by Ms. Findsen                          4

E X H I B I T S

Deposition
Exhibits                    Description                    Page

        (Exhibits 1 through 27 marked at commencement
            and retained by counsel for plaintiffs.)

Gina Feezer - 5/22/2014
BUFFINGTON-BEHRENS v. U.S. BANK, et al., 2:14-CV00615-SRB

Page 3

1        FRCP 30(B)(6)DEPOSITION OF U.S. BANK, NATIONAL

2    ASSOCIATION AS TRUSTEE FOR LEHMAN XS MORTGAGE PASS-THROUGH

3    CERTIFICATES, SERIES 2007-4N FRCP 30(B)(6), Gina Feezer,

4    was taken on May 22, 2014, commencing at 9:58 a.m., at the

5    offices of State Bar of Arizona, 4201 North 24th Street,

6    Suite 100, Phoenix, Arizona, before Shelley E.D. Pearce,

7    RPR, Certified Reporter No. 50301, in the State of

8    Arizona.

9

10   COUNSEL APPEARING:

11       On behalf of the Plaintiffs:
         LAW OFFICE OF BETH K. FINDSEN, PLLC
12       Beth K. Findsen, Esq.
         7279 East Adobe Drive
13       Suite 120
         Scottsdale, Arizona 85255
14       480.584.6664
         beth@findsenlaw.com
15
         On behalf of the Defendants:
16       HOUSER & ALLISON, APC
         Charles T. Piccuta, Esq.
17       9970 Research Drive
         Irvine, California 92618
18       949.679.1111
         ctpiccuta@houser-law.com
19
     ALSO PRESENT:
20
         Mr. Marc J. Findsen
21

22

23

24

25

Page 4

1                        GINA FEEZER,

2     called as a witness herein, having been first duly sworn

3     by the Certified Reporter to speak the truth and nothing

4     but the truth, was examined and testified as follows:

5

6                        EXAMINATION

7     BY MS. FINDSEN:

8          Q.   Good morning.  I am Beth Findsen.  We just met a

9     few minutes ago for the first time, correct?

10         A.   Yes.

11         Q.   I represent the plaintiff in this action, and

12    you understand that I'm here to question you under oath?

13         A.   Yes, ma'am.

14         Q.   Okay.  Can you give me your full name, please.

15         A.   Gina Feezer.

16         Q.   And have you ever gone by any other names?

17         A.   Johnson.

18         Q.   Gina Johnson as well?

19         A.   Yes.

20         Q.   Okay.  And are you married?

21         A.   No, divorced.

22         Q.   Okay.  And any children?

23         A.   Two.

24         Q.   Ages?

25         A.   Thirty-one and twenty-nine.

Case 2:14-cv-00615-DJH   Document 27-2   Filed 05/29/14   Page 5 of 28
Gina Feezer - 5/22/2014
BUFFINGTON-BEHRENS v. U.S. BANK, et al., 2:14-CV00615-SRB

Page 5

1    Q.    Okay.  I want to go through a little bit of your

2  work history.  Well, first, have you had your deposition

3  taken before?

4    A.    Yes, ma'am.

5    Q.    Okay.  So you understand that you -- the rules

6  of a deposition?

7    A.    Yes.

8    Q.    You need to speak out loud or the court reporter

9  can't take down a nod or inaudible response.

10    A.    Yes, I understand.

11    Q.    Okay.  How many times have you had your

12  deposition taken?

13    A.    I'm not sure.

14    Q.    More than 10?

15    A.    At least.

16    Q.    More than 20?

17    A.    I'm not sure.  I mean, it's part -- it's part of

18  my job duties at Ocwen.  So, from time to time, I've been

19  deposed, testified at trial, things of that nature.

20    Q.    From your -- every time you were deposed, was it

21  as a representative of Ocwen?

22    A.    Yes.

23    Q.    Every time you testified at trial, was it as a

24  representative of Ocwen?

25    A.    Well, not every time.  I mean, obviously, I've

Page 6

1    been divorced and I had a personal legal matter, but --

2        Q.    Okay.

3        A.    -- generally, yes.

4        Q.    But other than the divorce, have you been

5    involved in any litigation?

6        A.    No.

7        Q.    What states have you testified in for Ocwen?

8        A.    Various states.  I've testified all over the

9    country.

10       Q.    Have you testified in Arizona --

11       A.    No --

12       Q.    -- before?

13       A.    -- I have not.

14       Q.    What types of cases?

15       A.    Litigated mortgage cases.

16       Q.    Would you characterize the majority of those

17   cases as homeowner foreclosure litigation?

18       A.    Yeah, likely.

19       Q.    How would you characterize?

20       A.    Well, it's any litigation.  It could be title

21   claims, things of that -- things of that nature, anything

22   to do with the mortgage servicing.

23       Q.    Okay.  Title claims and mortgage -- well, then,

24   let's walk through your work history for Ocwen briefly.

25             When did you start working for Ocwen?

Page 7

1     A.    In October of 2004.

2     Q.    Okay.  What was your first position?

3     A.    I was the bankruptcy supervisor.

4     Q.    And what does a bankruptcy supervisor do?

5     A.    I managed a group of individuals that did the --

6  monitored the bankruptcy timeline.  Meaning, when any of

7  the assets -- any of the borrowers filed bankruptcy, the

8  group would file the proof of claims, things of that

9  nature, monitor the case while -- and refer it out to

10  counsel when necessary for legal action or things of that

11  nature up through until the discharge or the dismissal of

12  the bankruptcy.

13     Q.    So Ocwen would be the loan servicer in these

14  cases?

15     A.    Yes.

16     Q.    And Ocwen would prepare the proofs of claim in

17  the bankruptcy?

18     A.    A majority of the time, yes.

19     Q.    And you -- were you supervising other employees

20  or were you -- in that respect, or were you one of the

21  employees working on the proof of claim?

22     A.    No, I was the manager who supervised the group

23  that comprised of the bankruptcy department.

24     Q.    Okay.  And how -- how long did you hold that

25  position?

Page 8

1      A.   Until May of 2006.

2      Q.   And then what happened?

3      A.   I -- that's my current position as a senior loan

4  analyst.

5      Q.   And that was a promotion?

6      A.   I wouldn't call it -- necessarily call it a

7  promotion.

8      Q.   Sideways?

9      A.   Just a different job.  I mean, it was getting

10  back into the legal aspect of the -- as opposed to just

11  monitoring the process.

12      Q.   Okay.  So what are the job duties of a senior

13  loan analyst at Ocwen?

14      A.   I research contested litigated matters based

15  upon the servicing history of the loan, the company

16  policies and procedures, the business records, and report

17  my findings back to counsel.

18      Q.   Inside counsel or outside counsel?

19      A.   Could be either.

20      Q.   And when you say you research contested issues,

21  what -- what types of research do you do?

22      A.   It would be any case that the law department is

23  handling that is some type of contested litigated matter

24  involving one of the assets that Ocwen is a servicer of.

25      Q.   Where would you go to research?  Are you talking

Gina Feezer - 5/22/2014
BUFFINGTON-BEHRENS v. U.S. BANK, et al., 2:14-CV00615-SRB

Page 9

1    internal research, external research, or you tell me?

2        A.    Well, like I said, I research the business

3    records, the servicing history of the loan, and the

4    allegations or the question that the attorney asks me to

5    research regarding the loan, and I report that back to

6    counsel.

7        Q.    What types of issues arise?

8        A.    Anything that can come out of servicing

9    histories.  I mean, payment disputes, things of that

10   nature.

11       Q.    When you say the "business records," are you

12   referring to business records of Ocwen?

13       A.    Yes.

14       Q.    Do you have knowledge of business records,

15   custodial -- are you a custodian of records at any other

16   entity other than Ocwen?

17       A.    No.

18       Q.    Are you a business -- are you a custodian of

19   records at Ocwen?

20       A.    Yes.

21       Q.    You would consider yourself a custodian of

22   records at Ocwen?

23       A.    Yes.

24       Q.    So explain, then, to me the record-keeping

25   system at Ocwen.

Page 10

1    A.    We -- there's a comment log where any of the --

2  the servicing of the -- the life of the loan is

3  memorialized in the servicing records; and anybody that

4  deals with the loan, based on the servicing history of the

5  loan, will place a comment.  Any type of action that takes

6  place will be placed in the comment log or memorialized in

7  the database in some form or fashion, and those documents

8  are maintained by Ocwen for servicing the loan on behalf

9  of the trust that we service for.

10    Q.    And how do you know what trust you're servicing

11  for?

12    A.    Because each individual loan will indicate

13  who -- the owner of the note that we're servicing on

14  behalf of for each loan.

15    Q.    Where does that information come from?

16    A.    It's in our database.

17    Q.    So who put it in your database?

18    A.    Well, when the loan's boarded into our database,

19  we are appointed as servicer for a particular trust.  So

20  those -- all of those loans that comprise of that trust,

21  then, will be uploaded into our system and they're

22  affiliated with that particular trust.

23    Q.    So what -- and I've heard that term before,

24  "boarding" loan files into a servicer platform.  What --

25  what platform does Ocwen use?

Gina Feezer 06/22/2012
Case 2:14-cv-00615-DRB Document 27-2 Filed 05/29/14 Page 11 of 28
BUFFINGTON-BEHRENS v. U.S. BANK, et al., 2:14-CV00615-SRB

Page 11

1    A.    Real Servicing.

2    Q.    Okay.  And when the information is boarded, does

3  Ocwen, at that point, do anything to investigate the

4  accuracy of the information boarded?

5    A.    Oh, definitely.

6    Q.    What does Ocwen do?

7    A.    We have a loan setup team that is responsible

8  that, once we board the loans into our system, then

9  there's a period that they go through and -- a QC, if you

10 will, of making sure that the accuracy of the information

11 that was uploaded into Real Servicing is correct.  They'll

12 do a welcome call to the borrower.  They'll verify several

13 points in the data that's uploaded and active in our

14 system.  And the process can take sometimes between --

15 depending on how many loans board, anywhere between a

16 month to three months.

17   Q.    Does the loan setup team have a procedures

18 manual?

19   A.    I am not sure if they do or not.

20   Q.    Have you ever seen one?

21   A.    They -- they change that from time to time.  I'm

22 not aware of any.  Any research that I've done, I have

23 spoken to that department, particularly, if my research

24 requires those.  As I said, I've worked for Ocwen for a

25 number of years, so I'm familiar with the processes.  But

Gina Feezer - 5/22/2014
BUFFINGTON-BEHRENS v. U.S. BANK, et al., 2:14-CV00615-SRB

Page 12

1   I don't necessarily check the manual or check for a

2   manual, so I'm not sure if they do or they do not.

3      Q.   If they do, who would know about it?

4      A.   It -- I would.  I mean, it would be in our

5   database.  But, like I said, I've never -- I can't

6   definitively sit here and say that they do or they don't.

7   I have not looked for one.

8      Q.   So you didn't make any kind of reasonable search

9   for that manual before today?

10     A.   I didn't realize that it was a point of

11  contention based upon the topics in the deposition notice.

12  So, no, I did not check specifically for loan setup

13  policies and procedures.

14     Q.   When you said "QC," you meant quality control?

15  Is that what you mean?  I don't want to put words in your

16  mouth.

17     A.   Yeah, they do -- yes, they do a QC search to

18  make sure that the ending balances of the prior servicer

19  were the -- or their ending balance and their beginning

20  balance, if there's any payments that was made during the

21  transition time of the prior servicer to Ocwen, we make

22  those adjustments in our system and update that

23  information noting it in the comment log and, obviously,

24  updating the transaction history.  So there's a lot that

25  they do on the front end of the loan.  So we're still able

Page 13

1    to service the loan, but they're -- the loan setup team

2    works, like I said, during the first few months of the

3    loan boarding to make sure that all of the parameters are

4    set forth and up and accurate.

5         Q.   Do you know who -- who the loan setup team was

6    for this loan?

7         A.   Well, it's the loan setup team.

8         Q.   There's just one loan setup team?

9         A.   Yeah.

10        Q.   And correct me if I'm wrong.  Did the servicing

11   transfer to Ocwen recently or when did it?

12        A.   It was in -- I don't have the exact -- I think

13   it was in the fall of last year.

14        Q.   Right.  The fall of 2013 sound right?

15        A.   Yes, yeah.

16        Q.   Do you know how that came to be?  What did Ocwen

17   purchase and from whom?

18        A.   Well, it was a transfer from OneWest Bank.

19        Q.   Okay.  Did they buy the bulk of loans from

20   OneWest Bank?

21        A.   Yes.

22        Q.   Was there an agreement associated with that

23   sale?

24        A.   I'm sure that there was.

25        Q.   Have you seen it?

Page 14

1      A.   No.

2      Q.   Have you looked for it?

3      A.   Ma'am, that's outside the scope of my job

4   description to look for purchase sale agreements.

5      Q.   Okay.  But let's take a look, then, at what --

6   we've premarked the exhibits.  And if you don't -- if

7   there are no objections to that, we'll turn to

8   Exhibit 3 --

9      A.   In this book?

10     Q.   Yeah, Exhibit 3 in your exhibit book, please.

11          (Exhibit 3 referenced.)

12   BY MS. FINDSEN:

13     Q.   Have you seen this document before?

14     A.   Yes, ma'am.

15     Q.   And this is a notice of deposition --

16     A.   Yes.

17     Q.   -- for your appearance here today?

18     A.   Yes, it is.

19     Q.   And do you -- let's turn to page 2 and the first

20   paragraph.  Have you brought me any documents that

21   correspond to this paragraph?

22          MR. PICCUTA:  And I'm going to go on the record

23   and say this was addressed yesterday.  I explained to

24   Ms. Findsen that we won't be producing any documents today

25   because, pursuant to Judge Bolton's order at the last

Gina Feezer - 5/22/2014
BUFFINGTON-BEHRENS v. U.S. BANK, et al., 2:14-CV00615-SRB

Page 15

1  preliminary injunction hearing, there was no agreement or

2  order saying that document production would occur.  The

3  only thing that was allowed pursuant to that order was the

4  deposition of the PMK as well as two depositions of both

5  plaintiffs.

6        MS. FINDSEN:  Okay.

7        MR. PICCUTA:  So the answer to that question is

8  no; there are no documents, and you know that because you

9  don't have any --

10       MS. FINDSEN:  Well, your objection's noted, but

11  this is a 30(B)(6) deposition.  I've looked at the order

12  as well.  The order does not say that we could not ask for

13  documents.  I have the order right here.  Any 30(B)(6)

14  witness can be asked to bring documents to a deposition.

15  All she said is that we are entitled to a 30(B)(6)

16  deposition; and at a 30(B)(6) deposition, and as you know,

17  the party is representing -- the deponent is representing

18  the entity.

19       MR. PICCUTA:  Well, I disagree with what you're

20  saying because --

21       MS. FINDSEN:  And there's a duty under the rule

22  to look for information that would be reasonably available

23  to the corporation.

24       MR. PICCUTA:  There is not any order saying that

25  we're going to do document production.  There's no words

Page 16

1  saying we're going to do document production less than the

2  30 days that's mandated by the production rules.  And if

3  you want to stop the deposition, we can call Susan

4  Bolton -- Judge Bolton and get her opinion, we --

5          MS. FINDSEN:  We may end up there, Tony.

6          MR. PICCUTA:  Let's just do it right --

7          MS. FINDSEN:  'Cause I am going to go through --

8          MR. PICCUTA:  Let's just do it right

9  now 'cause --

10          MS. FINDSEN:  -- each of these because it

11  does --

12          MR. PICCUTA:  I'll stop the deposition now.  We

13  can call Judge Bolton and ask her what is the scope of

14  what's allowed today and we can go from there, because I'm

15  not going to allow you to misconstrue what that order is.

16  If there's any confusion or question, we can address it

17  and get it over with very quickly.  So let's not argue

18  about it.  Let's just get a decision.

19          MS. FINDSEN:  Okay.  Let's call her, then,

20  because you know what?  You got no protective order.  This

21  notice has been --

22          MR. PICCUTA:  I don't need a protective --

23          MS. FINDSEN:  -- on file for two weeks.

24          THE WITNESS:  It does not matter.  It's outside

25  the bounds of Judge Bolton's order.

Gina Feezer - 5/22/2014
BUFFINGTON-BEHRENS v. U.S. BANK, et al., 2:14-CV00615-SRB

Page 17

1          MS. FINDSEN:  No, it's not.

2          MR. PICCUTA:  Absolutely, it is.

3          MS. FINDSEN:  No, it's not.

4          MR. PICCUTA:  You want to argue about it?  We

5   can just ask her --

6          MS. FINDSEN:  Okay.

7          MR. PICCUTA:  -- her intention.

8          MS. FINDSEN:  Let's do.

9          MR. PICCUTA:  If she says it's one way --

10          MS. FINDSEN:  'Cause she loves discovery

11   disputes.

12          MR. PICCUTA:  I'll bet she does.  And I gave you

13   a proposal to not go through this.  We could have parsed

14   down your first verified amended complaint and then we

15   could address the relevant issues.  This isn't going to be

16   a scorcher of a discovery deposition.  That's not what it

17   is.

18          MS. FINDSEN:  There's no way --

19          MR. PICCUTA:  It's narrow and precise to the

20   issues in the motion for preliminary injunction.

21          MS. FINDSEN:  And these are the issues in the

22   preliminary injunction, because you have claimed harm on

23   behalf of Ocwen and U.S. Bank, and this is actually a

24   U.S. Bank NA deposition here today, and I'm not sure that

25   you brought me the witness that's most qualified to --

Page 18

1          MR. PICCUTA:  Oh, if you have a problem with the

2    witness --

3          MS. FINDSEN:  We'll see.

4          MR. PICCUTA:  -- we can end -- we can end the

5    deposition.

6          MS. FINDSEN:  We'll see.

7          MR. PICCUTA:  No problem.  I mean, if you're not

8    satisfied with our PMK, that's fine.  You have the right

9    to adjourn the deposition.

10         MS. FINDSEN:  If we end the deposition, it's

11   going to be counted as a nonappearance.

12         MR. PICCUTA:  That's fine.  You can do that.  If

13   you want to stop now and I'll take the deposition of --

14         MS. FINDSEN:  I'm going to find out what the

15   witness knows, and I'm going to find out what she knows

16   about Ocwen, but we can call the judge right now about

17   these documents --

18         MR. PICCUTA:  Absolutely.

19         MS. FINDSEN:  -- or you can stipulate right now

20   that you didn't -- that she can -- she can just answer the

21   question --

22         MR. PICCUTA:  No, I'd personally -- I'd

23   prefer --

24         MS. FINDSEN:  -- that she didn't bring number 1,

25   number 2, number 3, number 4, number 5, number 6, number

Page 19

1   7, number 8.  That's not --

2         MR. PICCUTA:  I'd prefer that we call Judge

3   Bolton to understand the scope of what the deposition was

4   supposed to be allowed --

5         MS. FINDSEN:  Okay.

6         MR. PICCUTA:  -- and I think you're well beyond

7   that.

8         MS. FINDSEN:  I have her number right here.

9         MR. PICCUTA:  Do we have conference call

10  capabilities here?  I'll just do it on my cell phone.

11        What number do you have for Judge Bolton?

12        MS. FINDSEN:  I have Bolton and her clerk.

13        MR. PICCUTA:  Why don't we do the clerk.

14        MS. FINDSEN:  (602) 322-7232.

15        MR. PICCUTA:  Give me the number again, please.

16        MS. FINDSEN:  (602) 322-7232.

17        MR. PICCUTA:  Actually, I suggest that we inform

18  Judge Bolton before we have her on the record.  So let's

19  go off temporarily.

20        THE COURT REPORTER:  Is that okay?

21        MS. FINDSEN:  Sure.

22        (Recess taken from 10:17 to 10:18 a.m.)

23        MR. PICCUTA:  We can go back on.

24        So we just made a telephone call to Judge Bolton

25  to see if she could entertain or listen to our discovery

Page 20

1  dispute and outline the parameters of today's deposition.

2       Counsel for defendant has taken the position

3  that the line of questioning and the areas where

4  plaintiffs' counsel wants to depose our PMK are outside

5  the scope of what was allowed by the court's order the

6  last time we were before the court.

7       Beth, do you have a position you want to state

8  what you --

9       MS. FINDSEN:  Sure.

10      MR. PICCUTA:  -- what you relate to?

11      MS. FINDSEN:  I just wanted to state for the

12  record that the deponent has not brought any documents in

13  response to the notice of deposition.  There were a few

14  areas of documents specified, one paragraph on page 2 of

15  the notice of deposition.  There has been no production.

16      MR. PICCUTA:  And I'll just put on the record

17  that the amended notice of deposition that she's referring

18  to was filed on May 19, 2014, three days ago, and the

19  previous judge's order did not discuss document

20  production, discovery, or anything of that nature.  So I

21  took the position and defendant took the position that

22  there would not be that type of discovery.  If we're not

23  going to come to an agreement as to what can be allowed

24  here today, my suggestion is, we adjourn this deposition

25  for a future date after we have a hearing in front of

Page 21

1  Judge Bolton as to what is allowed.

2      MS. FINDSEN:  I'm not adjourning this

3  deposition.  I'm going to find out what the witness knows,

4  but let me just say that I want to preserve my objection

5  and the right to -- to discuss the effects and whether

6  there should be any sanctions for failure to bring

7  documentation in response to notice.

8      MR. PICCUTA:  And I'll do one better than that.

9  We'll adjourn the deposition and --

10      MS. FINDSEN:  Because let me tell you something

11  else.  The judge didn't say that we couldn't ask for

12  discovery and, in fact, Mr. Piccuta asked for expedited

13  discovery given the nature of the preliminary injunction

14  hearing, which is in about two weeks from now --

15      MR. PICCUTA:  Wrong.

16      MS. FINDSEN:  -- an expedited time frame.

17  Everything is of record.  We have an audio and a

18  transcript from the hearing.  I told the judge that we

19  wanted a 30(B)(6) to talk about ownership issues, and she

20  gave the order that we were entitled to a deposition.

21      MR. PICCUTA:  Okay.  Very well.  We'll adjourn

22  for today, and then we can ask for --

23      MS. FINDSEN:  No, I --

24      MR. PICCUTA:  -- from Judge Bolton.

25      MS. FINDSEN:  No, I don't agree to adjourn.

Case 2:14-cv-00615-DJH Document 27-2 Filed 05/29/14 Page 22 of 28
Gina Feezer 5/22/2014
BUFFINGTON-BEHRENS v. U.S. BANK, et al., 2:14-CV00615-SRB

Page 22

1    MR. PICCUTA:  I'm taking my client out of the

2  room because I feel --

3    MS. FINDSEN:  No.

4    MR. PICCUTA:  -- where you're going with this

5  deposition's outside the bounds of what was allowed by the

6  court.  And if we can't get a decision from Judge Bolton,

7  like we tried to do, as to what areas you can depose my

8  client on, we're not going to continue.

9    MS. FINDSEN:  There's no --

10    MR. PICCUTA:  I am ending the deposition.

11    MS. FINDSEN:  I'm going to depose -- I'm going

12  to depose this witness about Ocwen and about the other

13  issues.

14    MR. PICCUTA:  No, you're not.  I'm instructing

15  my client not to answer any of your questions until we

16  have an order from the court outlining the scope of

17  today's deposition of what you are allowed to question

18  about.

19    MS. FINDSEN:  We'll certify that as a

20  nonappearance then.

21    MR. PICCUTA:  You can't.

22    And we both agree to go off the record?

23    THE WITNESS:  Do we go?

24    MR. PICCUTA:  No, we have to wait for Beth.

25  Can't go off unless --

Page 23

1          MS. FINDSEN:  I don't agree to adjourn the

2    deposition, though.  Just for the record, Mr. Piccuta is

3    walking out with the witness.  We have lots of areas that

4    we have no dispute about, and he is not allowing me to

5    question the witness on the areas of -- that we have --

6          MR. PICCUTA:  Let's go over those areas.

7          MS. FINDSEN:  -- for the preliminary injunction.

8          MR. PICCUTA:  And let's make sure we have an

9    understanding what those areas are going to be --

10          MS. FINDSEN:  Okay.

11          MR. PICCUTA:  -- because it's outside the bounds

12    of even what you put in your supposed PMK notice.

13          MS. FINDSEN:  What's outside the bounds?

14          MR. PICCUTA:  All the securitization questions,

15    all the payments, these things aren't addressed in the

16    motion for preliminary injunction.

17          MS. FINDSEN:  It's harm for preliminary

18    injunction.  You are claiming that your client is harmed

19    if we postpone a foreclosure sale for six months.  So I'm

20    entitled to know how Ocwen and U.S. Bank National

21    Association as Trustee for the Lehman LX N 2007 [sic]

22    Trust are damaged by a six-month postponement of a trustee

23    sale while title issues are litigated in federal court.

24          MR. PICCUTA:  You haven't asked any questions

25    about that, Beth.

Page 24

1          MS. FINDSEN:  I haven't had a chance.  I started

2   with 10 seconds.  You know, it's pretty -- it's quite

3   normal to go through a notice of deposition and ask if

4   anything was brought in response to the notice.

5          MR. PICCUTA:  Not when there was no documents

6   that were allowed by the court.  This isn't a discovery

7   deposition.  This is a deposition that narrowly --

8          MS. FINDSEN:  All depositions are discovery.

9          MR. PICCUTA:  -- it's narrowly tailored for the

10  purposes of preliminary injunction only.  It wasn't a

11  chance for you to ask every question you want to regarding

12  your verified first amended complaint.  It had to do with

13  the motion for preliminary injunction.

14         MS. FINDSEN:  Let me ask you something.

15         MR. PICCUTA:  It's really clear.  We don't --

16         MS. FINDSEN:  What's the first element of a

17  preliminary injunction?

18         MR. PICCUTA:  You're not going to depose me.

19         MS. FINDSEN:  Substantial likelihood of --

20         MR. PICCUTA:  You're not deposing --

21         THE COURT REPORTER:  I can only get one at a

22  time.

23         MR. PICCUTA:  You're not deposing me, Beth.

24  It's really simple.  We don't agree.  We're going go to

25  the court and she'll issue an order, and she'll tell us

Gina Feezer   5/22/2014
Case 2:14-cv-00615-DJH   Document 27-2   Filed 05/29/14   Page 25 of 28
BUFFINGTON-BEHRENS v. U.S. BANK, et al., 2:14-CV00615-SRB

Page 25

1   what we can do and what we can't do.  If we need to get a

2   discovery referee, we'll do that, too.  But what's not

3   going to happen is, we're not going to continue today with

4   you asking all these questions that are completely outside

5   the scope of the original order issued by Judge Bolton.

6   It's that simple.  That's our position.  I'm taking my

7   client and I'm leaving.

8         MS. FINDSEN:  There's no scope in the order.  It

9   says I'm entitled to a 30(B)(6) deposition.  It's right

10  here.  [As read]:  At the request of counsel, which was

11  you, it is ordered counsel may conduct discovery limited

12  to the scheduling of plaintiffs' deposition and a 30(B)(6)

13  witness.

14         I'm not agreeing to this adjournment.

15         MR. PICCUTA:  It's not an adjournment.  I'm

16  leaving with my client over objection of plaintiffs'

17  counsel.  I'm going to let Judge Bolton decide what the --

18  what the repercussions are, if your area of questioning

19  and what you're trying to do is appropriate.

20         MS. FINDSEN:  It's your choice.

21         MR. PICCUTA:  Yeah, absolutely, it is.

22         MS. FINDSEN:  So, for the record, the deponent's

23  left and counsel is about to leave, and we can go off

24  record.

25         (The deposition terminated at 10:24 a.m.)

Page 26

1                        SIGNATURE PAGE

2

3          I, GINA FEEZER, a deponent exercising my

4   right to read and sign my deposition taken on May 22,

5   2014, at the aforementioned time and place, do hereby

6   attest to the correctness of the transcript (or make

7   changes under separate cover) under penalty of perjury by

8   placing my signature hereon on this _____ day of

9   _____, 2014.

10

11

12

13

14                              _____

15                                  GINA FEEZER

16

17

18

19

20

21

22

23

24

25

BUFFINGTON-BEHRENS v. U.S. BANK, et al., 2:14-CV00615-SRB

Page 27

1   STATE OF ARIZONA     )
                               )     ss.

2   COUNTY OF MARICOPA     )

3

4              BE IT KNOWN that the foregoing deposition

5   was taken by me pursuant to stipulation of counsel; that

6   I, Shelley E.D. Pearce, RPR, Certified Reporter No. 50301,

7   in the State of Arizona, and by virtue thereof, am

8   authorized to administer an oath; that the witness before

9   testifying was duly sworn by me to testify to the whole

10   truth; that the questions propounded by counsel and the

11   answers of the witness thereto were taken down by me and

12   reduced to print under my direction; that the foregoing 26

13   pages are a full, true, and accurate transcript of all

14   proceedings and testimony had and adduced upon the taking

15   of said deposition, all to the best of my skill and

16   ability.

17       I FURTHER CERTIFY that I am in no way related to nor

18   employed by any of the parties hereto, nor am I in any way

19   interested in the outcome hereof.

20       DATED at Phoenix, Arizona, this 24th day of May,

21   2014.

22

23                       SHELLEY E.D. PEARCE, RPR
                          Arizona Certified Reporter

24                       Certificate No. 50301

25

27

STATE OF ARIZONA      )
                          )   ss.
COUNTY OF MARICOPA   )

BE IT KNOWN that the foregoing deposition was taken by me pursuant to stipulation of counsel; that I, Shelley E.D. Pearce, RPR, Certified Reporter No. 50301, in the State of Arizona, and by virtue thereof, am authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; that the questions propounded by counsel and the answers of the witness thereto were taken down by me and reduced to print under my direction; that the foregoing 26 pages are a full, true, and accurate transcript of all proceedings and testimony had and adduced upon the taking of said deposition, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any of the parties hereto, nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 24th day of May, 2014.

_Shelley E.D. Pearce_
SHELLEY E.D. PEARCE, RPR
Arizona Certified Reporter
Certificate No. 50301